### In re WASHINGTON MANUFACTURING COMPANY, Washington Industries, Inc. and KSA, Inc., Debtors.

**Bankruptcy Nos. 388–01467, 388–01468 and 388–01469.**

United States Bankruptcy Court, M.D. Tennessee, Nashville Division.

June 23, 1989.

---

William J. Rochelle, III, Kronish, Lieb, Weiner & Hellman, New York City, James R. Kelley, Dearborn & Ewing, Nashville, Tenn., for debtors.

Russell H. Hippe, Jr., Trabue, Sturdivant & DeWitt, Nashville, Tenn., for Unsecured Creditors Committee.

Frank Childress, U.S. Trustee, Nashville, Tenn.

Ronald W. Hanson, Latham & Watkins, Chicago, Ill., Bradley A. MacLean, Farris, Warfield & Kanady, Nashville, Tenn., for Citicorp North America, Inc.

Craig V. Gabbert, Jr., Harwell, Bar, Martin & Stegall, Nashville, Tenn., for Chapter 11 Trustee.

## MEMORANDUM OPINION AND ORDER ON KRONISH, LIEB'S APPLICATION FOR FINAL ALLOWANCE OF COMPENSATION AND REIMBURSEMENT OF EXPENSES AND ON THE OBJECTIONS FILED

WILLIAM H. BROWN, Bankruptcy Judge, Sitting by Designation.

This core proceeding[1] was initiated by the filing of an "Application Of Kronish, Lieb, Weiner & Hellman, Attorneys For The Debtors In Possession, For Final Allowance Of Compensation and Reimbursement Of Expenses." The application was heard with the comments or objections filed by the Unsecured Creditors' Committee, by the Assistant United States Trustee for Region VIII and by the Chapter 11 Trustee, and with oral statements of counsel. At the hearing a briefing schedule was established and, after extensions, the final memoranda have now been filed. Having considered the entire record related to this application, comments, objections, oral hearing, exhibits and legal memoranda, the Court makes the following findings of fact and conclusions of law, pursuant to Bankruptcy Rule 7052.

### HISTORY OF CASE

Three voluntary chapter 11 cases were filed by the debtors on March 1, 1988, which cases are being jointly administered. On March 15, 1988, upon application dated March 1, 1988, this Court entered an order approving the employment of the New York law firm of Kronish, Lieb, Weiner & Hellman ("Kronish, Lieb") and the Nashville law firm of Dearborn & Ewing to represent the debtors in possession. On

---

**1.** 28 U.S.C. § 157(b)(2)(A) and (B).

March 18, 1988, with the consent of the debtors, the Court appointed a Chapter 11 Trustee, Timothy L. Finley, after which time the role of debtors' counsel diminished. The cases have continued in Chapter 11, with a liquidation being conducted by the Trustee.

## ISSUES

The issues presented are not necessarily unique but are numerous. The primary issues are whether the Kronish, Lieb firm will be allowed to charge at its customary rates or will be limited to Nashville, Tennessee rates and whether the Kronish, Lieb firm will be allowed an expense charge for work requested by the law firm but performed by another professional entity, Kalliste Corporation ("Kalliste"). Related to the first issue is a question of whether the debtors should have retained counsel outside the Nashville area. Further, issues of duplication of services, unnecessary charges, overhead charges, and value of the services are presented. Because the requested charges and expenses are relatively large, and because the issues are important for their potential impact upon future fee applications in this District as well as in the Western District of Tennessee,[2] the Court will address each issue separately in this opinion.

## DEBTORS' RETENTION OF NONLOCAL COUNSEL

■ Underlying the objections to the allowance of charges higher than the normal Nashville, Tennessee rates for bankruptcy practitioners is an issue of whether these debtors had good cause to seek out and retain counsel from outside the Nashville area. It was argued by the Chapter 11 Trustee that local counsel existed with adequate ability to represent these debtors. The Court has no doubt that is true; however, there has been no showing that local counsel existed who were in a position to

represent these debtors. The debtors' local counsel, Dearborn & Ewing, correctly believed that it should not serve as primary debtors' counsel in the bankruptcy cases because one of its partners had served as a director of one of the debtor corporations and therefore would not have been "disinterested" as required by 11 U.S.C. § 101(13)(D) and § 327(a). The creditors and other interested parties should not, as a general rule, be able to dictate the debtors' choice of its counsel. *In re Microwave Products of America, Inc.*, 94 B.R. 971 (Bankr.W.D.Tenn.1989); *In re Hecks, Inc.*, 83 B.R. 410, 17 B.C.D. 542 (S.D.W.Va.1988); 2 King, COLLIER ON BANKRUPTCY, ¶ 327.03-2 (15th Ed.1989). Section 327(a) of the Bankruptcy Code provides that the debtor in possession[3] "with the court's approval, may employ one or more attorneys." The Kronish, Lieb firm promptly filed an application for its employment, which was approved by the entry of the Court's Order, and no objection was made to that employment until the fee application was filed.

■ It might be argued that the objectors had waived their objections to the employment of nonlocal counsel by not timely moving that the Court set aside its order approving the employment of Kronish, Lieb, and the Court notes that immediately upon the filings of these cases, there was activity before the Court in which Kronish, Lieb's participation was made known to the objecting parties. However, it is not necessary for a waiver to be imposed because the Court finds that there was good cause for these debtors to choose a nonlocal firm. Not only was the debtors' local counsel unable to serve as general counsel, that same local counsel was involved in the initial meeting between the debtors' chief operating officer and Mr. Rochelle of the Kronish, Lieb firm. It certainly may be inferred that the Dearborn & Ewing firm played a role in the selection of the Kron-

---

**2.** Judge William Houston Brown normally presides in the United States Bankruptcy Court for the Western District of Tennessee but was designated to preside over these jointly administered cases by the United States Court of Appeals for the Sixth Circuit by Order dated March 2, 1988.

**3.** At the time of application for employment of debtors' counsel, the debtors were debtors in possession, with the authority of a trustee under 11 U.S.C. § 1107(a).

ish, Lieb firm. It is also logical that Dearborn & Ewing, a Nashville firm, would be in. position to advise the debtors of local counsel to consider. Neither this Court, creditors, the case trustee nor the U.S. Trustee were in a position, nor should they be, to make such a choice for these debtors. *See, e.g., In re Hecks, Inc., supra; In re Allard,* 23 B.R. 517, 7 C.B.C.2d 854 (E.D. Mich.1982). Rather, if the choice is inappropriate for any reason, a party in interest should promptly bring that to the Court's attention by a motion seeking to set aside or to terminate the employment of the debtor-in-possession's choice of professional persons.

Further, both representations made in support of the pending fee application, as well as the case history before the Court, indicate that these were not "simple" nor "local" cases. As represented in one of Kronish, Lieb's memoranda, "[t]he debtor had approximately 3,800 employees and gross sales as high as $158,000,000. The matrix lists creditors in more than 27 states." The Chapter 11 Trustee's counsel argued that the joint case was not "national" in scope but rather was limited in significant impact to a 150 mile radius of Nashville. That is negated by the fact that within four days of the Chapter 11 filing, this Court conducted an emergency hearing involving a national manufacturer and its North Carolina attorneys. An emergency hearing was also conducted before the United States District Court for the Middle District of Tennessee involving the debtor, national manufacturers and the United States Department of Labor. Other hearings have been held throughout the case which involved entities outside of Nashville or the Middle Tennessee area. The Chapter 11 Trustee has paid in excess of seventeen million dollars in administrative and operating expenses. The primary secured creditor filed a proof of claim for in excess of $39 million. While this may not be a "national" case, it is obviously not a local or routine one.

The size and nature of the cases demanded rapid response to critical needs of the debtors. As is typical, cash collateral was an immediate problem, and the debtors' primary lender was Citicorp North America, Inc. ("Citicorp"), which has been represented by Chicago and Nashville counsel. The underlying reality is that a debtor in a crisis environment may not enjoy the luxury of shopping extensively for counsel, even locally. Rather, rapid decisions are required. This Court does not choose to adopt a policy of requiring potential bankruptcy debtors to exhaust the local attorney pool before hiring nonlocal counsel, and the Court will not preface this opinion with any assumption that there is something inherently wrong with debtors retaining nonlocal attorneys or other professionals. *See, In re Public Service Co. of New Hampshire,* 86 B.R. 7, 17 B.C.D. 673 (Bankr.D.N.H.1988) (hereinafter "Public Service"). Rather, on a case by case basis a decision must be made, ultimately by the Court if necessary, as to whether the debtors' choice of counsel is proper. One of the considerations certainly may be the level and nature of the bankruptcy experience of the nonlocal firm. William Rochelle, a partner in the Kronish, Lieb firm, represented to this Court that one of the reasons for his firm's selection as debtors' counsel was the experience of both the firm and of Mr. Rochelle in similar cases, as well as in "national" bankruptcy cases. As a general concept, this Court sees no justification for a blanket rule prohibiting nonlocal counsel and the Court doubts that debtors generally will search for nonlocal counsel in the typical case. On the other hand, in a case with more than a local impact, nonlocal counsel certainly is not unusual.

Discouraging nonlocal counsel in this case would be an anomaly since the primary secured creditor has both local and Chicago counsel and especially since the case trustee is not local. With the advice and consent of creditors, the Court appointed, prior to the effective date of the U.S. Trustee for this Region, a chapter 11 Trustee from North Carolina. That Trustee has obtained approval of the Court to employ counsel both in Nashville and in North Carolina. Several creditors and affected entities have been represented by out-of-state

counsel. Further, because it was necessary for a nonlocal bankruptcy judge to be designated by the Sixth Circuit, some hearings on emergency matters have been conducted in Memphis, Tennessee, as well as in Nashville, thereby rendering all counsel in the case nonlocal.

## LOCAL VS. NONLOCAL RATES

Closely related to the issue of the debtors' choice of nonlocal counsel is the rate at which that counsel will be permitted to charge for legal services performed for the debtor. While it is difficult to separate this issue from the examination of the over-all benefit to the estate by the professional work performed, the Court will address first the question of whether Kronish, Lieb will be permitted to charge at its regular New York rates rather than at the lower, prevailing Nashville rates. Then, the

Court will examine whether there must be any adjustments in the charges to account for weighing the benefits derived.

The beginning point is 11 U.S.C. § 330(a) which provides the authority for the Court to award

> (1) reasonable compensation for actual, necessary services rendered by such ... professional person, or attorney, ... and by any paraprofessional persons employed by such ... professional person, or attorney, ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

> (2) reimbursement for actual, necessary expenses.

The following billing rates are sought by the Kronish, Lieb firm:

| | |
|---|---|
| Richard Lieb | $325 per hour (9.4 hours) |
| Peter J. Mansbach | $305 per hour (13.1 hours) |
| Joe Lewittes | $280 per hour (4.0 hours) |
| Lawrence J. Kaiser | $250 per hour (28.0 hours) |
| William J. Rochelle, III | $250 per hour (134.5 hours) |
| Martha J. Rix | $180 per hour (184.2 hours) |
| Lisa Soloman | $160 per hour (12.8 hours) |
| Nancy L. Kourland | $110 per hour (86.3 hours) |
| David A. Rosenzweig | $110 per hour (34.3 hours) |
| William Coleman (paralegal) | $65 per hour (4.8 hours) |

Further, the firm's prepetition work began on February 20, 1988 with a telephone conference from Mr. Jim McElroy of the Dearborn & Ewing firm and the work continued through June 14, 1988, involving a total of 506.6 hours of post-petition professional's time and 4.8 hours of paraprofessional time. The firm did not bill for time related to preparation of its fee petition nor has the firm yet requested allowance for its time in defending its fee application.

The Court has the "authority and responsibility to determine the reasonableness of all fee requests, regardless of whether objections are filed." *In re Temple Retirement Community, Inc.,* 97 B.R. 333, 336 (Bankr.W.D.Texas, 1989) (hereinafter "Temple Retirement"), quoting *Matter of Pothoven,* 84 B.R. 579, 583 (Bankr.S.D. Iowa 1988). As the *Temple Retirement* Court observed, this judicial duty can be

seen in the wording of 11 U.S.C. § 330(a)(1). *Temple Retirement,* 97 B.R. at 336. In this case, there were objections, both written and oral. Awarding of fees is discretionary, "bounded by (1) whether the compensation is reasonable and (2) whether the services were actually rendered and were necessary." *Temple Retirement,* 97 B.R. at 336, citing *In re Nucorp Energy, Inc.,* 764 F.2d 655, 658, 13 B.C.D. 435, 12 C.B.C.2d 1463 (9th Cir.1985). Ultimately, protection of the estate from undue expense, protection of creditors from overreaching by professionals, and protection of the public interest in the integrity and fairness of the bankruptcy system is more important than protection of the professionals involved from reduction in their requested fees. *See e.g., Temple Retirement, supra; In Matter of Consolidated Bancshares, Inc.,* 785 F.2d 1249, 14 B.C.D.

401 (5th Cir.1986); *In re United Merchants and Manufacturers, Inc.*, 674 F.2d 134, 6 C.B.C.2d 321 (2d Cir.1982); *In re Bain*, 527 F.2d 681 (6th Cir.1975); *In re Gulf Consolidated Services, Inc.*, 91 B.R. 414 (Bankr.S. D.Tex.1988). The Sixth Circuit recognized and adopted by dicta at least these general principles in a Bankruptcy Act case, in which that Court recognized the "economic spirit of frugality" underlying bankruptcy administration, the benefit to the estate test, as well as the "time spent," the "difficulties or intricacies," the "skill required and experience of counsel in similar cases," "the results accomplished," the total amount requested for compensation, "the size of the estate," the length of time over which the work was performed, and "the contingency or certainty of compensation." *Cle–Ware Industries, Inc. v. Sokolsky*, 493 F.2d 863, 867–69 (6th Cir.1974); *cert. den. sub. nom. Sokolsky v. Cle–Ware Industries, Inc.*, 419 U.S. 829, 95 S.Ct. 50, 42 L.Ed.2d 53 (1974).

However, as the *Temple Retirement* Court pointed out, the Bankruptcy Code altered a too-strict view of merely looking to administrative economy, in that the Code recognizes that bankruptcy specialists may be entitled to higher compensation than they would by simple measurement against a standard of absolute economy. *See Temple Retirement*, 97 B.R. at 340, n. 9, citing H.R.Rep. No. 595, 95th Cong.2d Sess 329–330 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5963, 6286; *see also* 11 U.S.C. § 330(a)(1); *In re Manoa Finance Co., Inc.*, 853 F.2d 687, 689, 18 B.C.D. 295, 19 C.B.C.2d 574 (9th Cir.1988). Bankruptcy practitioners are compensated in part by consideration of "comparable" nonbankruptcy work. 11 U.S.C. § 330(a)(1); *compare Pennsylvania v. Delaware Valley Citizens' Council for Clear Air*, 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). "The true point of departure from pre-Code law is the directive to assure comparability, while still retaining sufficient control to prevent excessive fee awards." *Temple Retirement*, 97 B.R. at 342; *see also In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 12 B.C.D. 978 (Bankr.D.Utah 1985).

Therefore, as to the hourly rate to be allowed, the appropriate question to ask may be "What is the range of rates charged by attorneys of comparable competence for comparable services in the comparable community or marketplace?" *Temple Retirement*, 97 B.R. at 342. As the *Temple Retirement* Court observed, for normal civil litigation, this leads to a consideration of the "local community in which the services are rendered." *Id.* But, "[m]any bankruptcy cases are often more regional or even national than they are local in scope, so that looking solely to the local community's range of rates would impose an unnecessarily parochial cap on the case." *Id.; see also Public Service*, 86 B.R. at 11.

As the *Temple Retirement* and *Public Service* Courts recognized, a debtor may be justified in bringing in outside counsel either because the case is unique or because local counsel is not available or is not sufficiently specialized, and in such cases, the professionals may be entitled to charge for services at their normal rather than local rates. *Temple Retirement*, 97 B.R. at 342–43: *Public Service*, 86 B.R. at 11; *see also In re Frontier Airlines, Inc.*, 74 B.R. 973, 976–77, 16 B.C.D. 107 (Bankr.D.Colo. 1987). *Compare In re S.T.N. Enterprises, Inc.*, 70 B.R. 823, 843, 15 B.C.D. 871, 16 C.B.C.2d 1355 (Bankr.D.Vt.1987) (recognizing that in complex, "national scope" cases, nonlocal rates may apply). This concept has been recognized in this Circuit by bankruptcy courts. *In Matter of Baldwin–United Corp.* 36 B.R. 401, 403, 10 C.B.C.2d 273 (Bankr.S.D. Ohio 1984); *In re Atlas Automation, Inc.*, 27 B.R. 820, 823, 10 B.C.D. 118, 8 C.B.C.2d 236 (Bankr.E.D. Mich.1983); *In re Southern Industrial Banking Corp.*, 41 B.R. 606 (Bankr.E.D. Tenn.1984). This Court, sitting in Memphis, has also recognized this concept in an unpublished opinion. *In re Beale Street Landing*, unpub., BK No. 86–24872–B (Bankr.W.D.Tenn. May 8, 1989). In *Beale Street*, this Court allowed Chattanooga counsel to charge at their normal Chattanooga rates rather than at lower Memphis rates, due to the expertise of the specific

Chattanooga counsel in the particular type of chapter 11 involved.

The Sixth Circuit has also generally recognized the concept of looking to a national marketplace for comparable fees, saying that "courts are free to look to a national market, an area of specialization market, or any other market ... appropriate to fairly compensate particular attorneys in individual cases." *Louisville Black Police Officers Organization, Inc. v. City of Louisville,* 700 F.2d 268, 278 (6th Cir.1983) (a civil rights case interpreting *Northcross v. Board of Education of Memphis,* 611 F.2d 624 (6th Cir.1979), *cert. denied* 447 U.S. 911, 100 S.Ct. 2999, 64 L.Ed.2d 862 (1980)).

■ In an appropriate case, the prevailing rates of nonlocal counsel or the rate prevailing in the case locality should be merely factors, not self-limiting ones, in the court's determination of the reasonableness of the over-all charges made and sought. *Temple Retirement,* 97 B.R. at 10; *Public Service,* 86 B.R. at 10. Ultimately, the allowable rate "is what the court perceives to be the reasonable value of the services in the market place [however small or expansive that may be under the circumstances of each case], with due deference to the cost of comparable services." *In re Gulf Consolidated Services, Inc.,* 91 B.R. at 420 n. 4.

■ Here, the Court is satisfied that sufficient reason existed for the debtors' retention of the Kronish, Lieb firm so that this Court will not limit its fee award to the Nashville rates. *See In re Wilson Foods Company,* 36 B.R. 317, 321, 11 B.C.D. 722 (Bankr.W.D.Okla.1984); *but cf., In re Pacific Express, Inc.,* 56 B.R. 859, 13 B.C.D. 1343, 14 C.B.C.2d 157 (Bankr.E.D.Cal.1985). The specialization of the Kronish, Lieb firm in bankruptcy reorganizations of this type, the participation in that decision by the debtors' local counsel, the urgencies of the debtors' financial condition, the regional nature of the debtors' holdings and creditors, the fact that the primary creditor was a national lender, the locale of some large unsecured creditors in New York, and the involvement of nonlocal counsel for several creditors all support the reasonableness of the debtors' selection of Kronish, Lieb. There is in fact no showing that Kronish, Lieb was inappropriately retained.

■ Perhaps, as was followed in *Public Service Company of New Hampshire, supra,* the prudent course for nonlocal counsel would be to move the bankruptcy court for approval of its regular rates prior to that counsel's devotion of significant time to the case. However, this Court will not retroactively require that of Kronish, Lieb, nor will this Court adopt a general rule of such a requirement. In fact, because of the urgencies usually accompanying a bankruptcy filing, debtor's counsel may find it difficult to obtain court approval of the rates to be charged prior to significant work being done. Further, if pre-approved, the "regular hourly rates [would not] become *ipso facto* final fee awards" by the Court. *Public Service,* 86 B.R. at 11. Rather, upon the filing and noticing of a fee application, the Court will review the total fee award in the light of the case, the results rendered and other appropriate factors.

Having conducted such a review, this Court, being satisfied of the circumstances justifying the retention of Kronish, Lieb, and not being persuaded that Kronish, Lieb's hourly rates are unreasonable in light of the attorneys' experience, will approve the New York rates charged by Kronish, Lieb for work performed in this chapter 11 case. *See generally, In re Atlas Automation, Inc.,* 27 B.R. at 823; *Temple Retirement, supra. Compare In re Southern Industrial Banking Corp.,* 41 B.R. at 612–13.

## REASONABLENESS OF TOTAL FEE REQUEST

This brings the Court to consider whether the total fees, as requested by Kronish, Lieb, should be approved or whether reductions should be made in the overall fee request. First, the Court has no quarrel with the detail given by Kronish, Lieb other than the Court would encourage less "lumping" of multiple tasks under a singular time description. *See, e.g., In re NRG*

*Resources, Inc.*, 64 B.R. 643, 654 (W.D.La. 1986). The Kronish, Lieb application has attached to it an exhibit of computerized billing memorandum, which contains a descriptive diary of each attorney's activity on a daily basis. It is certainly true that the descriptions may always be more detailed; however, this billing memorandum meets the requirements of *In re Tolan*, 41 B.R. 751 (Bankr.M.D.Tenn.1984) that the application be supported by specificity. *See also* Bankruptcy Rule 2016; *In re Rhoten*, 44 B.R. 741, 12 B.C.D. 561, 11 C.B.C.2d 1033 (Bankr.M.D.Tenn.1984); *Cle–Ware Industries, Inc. v. Sokolsky, supra.* Ultimately, the itemization of professional services must only "be sufficiently detailed so as to permit identifying the project or tasks performed, the person performing the task and the hours spent by each" professional. *In re Frontier Airlines, Inc.*, 74 B.R. at 976, quoting *Ramos v. Lamm*, 713 F.2d 546, 553 (10th Cir.1983).

■ As Kronish, Lieb observed in its legal memorandum filed in support of its application, it should not be penalized by a rigid use of the U.S. Trustee's guidelines for fee applications, since the U.S. Trustee for this Region did not become certified until after these cases were filed, and the Court must apply discretion in determining how specific time records must be. In a complex case, professionals must provide detailed diaries of their work; however, the Court is mindful that counsel could easily spend too much time and paper explaining the details of a sixteen hour work day, as was spent by Mr. Rochelle on March 2, 1988. As Kronish, Lieb stated, "Good-looking time records do not mean that work actually was done or that the work was productive. However the time records look, the Court must form a judgment as to whether the amount of recorded time was in proportion to the demands of the case. In short, time records are only one element in the allowance of compensation." Kronish, Lieb *Memorandum*, p. 36. That is not to excuse the need for cogent detail, and the Court does not wish to encourage too

hastily prepared fee records, but the Court also does not hesitate to encourage concise time and expense records. If the records are not sufficient, the Court will require more detail, but in the present application, the detail is sufficient for the Court to compare the attorneys' description of the work to the results seen by the Court. The Court does not doubt that the work billed by Kronish, Lieb was actually performed. Both the time records and the pleadings filed support that the work was performed.

Further, a comparison of the Kronish, Lieb time records shows comparable detail and explanation to those submitted by the Trustee's counsel, which the Court has approved without significant objection from the U.S. Trustee. However, the Court notes that the Trustee's counsel did not "lump" multiple tasks.

The application for compensation excludes travel time, by an amendment to that application; therefore, the Court does not need to discuss in this opinion whether travel time is compensable. *See generally, In re Frontier Airlines, Inc.*, 74 B.R. at 978–79 [4].

■ Duplicative work is asserted in the U.S. Trustee's comments, with specific time entries pointed out by that office as evidence that more than one attorney worked on the same matter. However, simply because two or more professionals work on the same pleading or matter does not mean that the work is duplicative. In a complex case, especially one in which debtors' counsel is immediately faced with emergency pleadings and hearings, it may be necessary to allocate various portions of one pleading or matter to two or more attorneys. *See, e.g., In re N–Ren Corporation*, 71 B.R. 488, 490–91 (Bankr.S.D.Ohio 1987) (In a case of magnitude it is not unreasonable to have two experienced attorneys "familiar with and involved in the representation."). The very fact that a law firm has multiple attorneys available may be one of the reasons and the justification for a debtor's choice of that firm to handle a complex bankruptcy case. *See e.g., In re Frontier*

---

**4.** The fee application was voluntarily reduced by $3,500.00 for necessary travel by Mr. Kaiser, travel time which this Court would have been inclined to allow.

*Airlines, Inc.,* 74 B.R. at 977. In this case, the Court recognizes that Kronish, Lieb was required to quickly get "up to speed" on a case in which they had apparently had no previous involvement and that it is difficult, by hindsight, to evaluate how much time was needed to accomplish the tasks under emergency conditions.

However, the Court does not mean to suggest that work performed by more than one attorney will routinely be approved as compensable. Rather, the Court must look again at whether the total work performed was reasonably necessary. The examination of Kronish, Lieb's application reveals that much time was devoted to pleadings which the firm, based upon its expertise, would not need to extensively research. For example, within six days from March 4, 1988, to March 9, 52.3 hours were spent on research, pleadings and memoranda concerning the appointment of a trustee. Several attorneys spent numerous hours reviewing or revising the trustee memorandum and issues. However, the appointment of a trustee in these cases was not routine but was crucial given that management was no longer effectively in place to perform such duties as the timely filing of schedules. No one was available to run the business, and moving for the appointment of a trustee, in hindsight, was the correct decision by Kronish, Lieb.

The Court recognizes that what may appear to be a routine matter is not always routine in the context of a given case, and also the Court recognizes that the descriptions of work done will not always explain the exigencies of a particular matter. Moreover, the Court is well aware of the expertise and competence of the Kronish, Lieb attorneys. Therefore, in an effort to give them "the benefit of the doubt," the Court will not reduce this fee request because of what in retrospect may appear to be excessive or duplicative work for routine matters. However, the Court suggests that in the future, counsel spend more time justifying what may appear to be excessive time for what may appear to be routine work. That is the only way the Court and other parties in interest may have to distin-

guish the requested time charges for actual services from the routine.

This case is not one in which the attorneys duplicated services by having two or more attorneys present at the same conferences or hearings. *See, e.g., In re NRG Resources, Inc., supra.* Rather, Kronish, Lieb divided work, which needed to be quickly performed, among several attorneys. The Court finds this proper and necessary in a case such as this. *See generally In re Frontier Airlines, Inc.,* 74 B.R. at 977–780. An absence of duplication is illustrated by the fact that Kronish, Lieb sent only one attorney to court hearings.

In the Chapter 11 Trustee's brief in support of his objection, it is asserted that an overall fee reduction is called for because, *inter alia,* "a substantial portion of the postpetition services ... rendered to debtors, ... consist of continued negotiations with CNA [Citicorp]" for the "primary purpose" of allowing debtors to use cash collateral and these negotiations were unsuccessful while the Trustee's negotiations, approximately three weeks later, resulted in an agreed order for the debtors' use of cash collateral. Therefore, according to the Trustee, any services rendered by the Kronish, Lieb attorneys in an attempt to obtain the use of cash collateral resulted in no benefit to the estate. In comparison to this assertion by the Trustee, Kronish, Lieb sets forth its activities and position with regard to the cash collateral issue on page 12 of its "Memorandum of Law ..." submitted February 10, 1989, as follows:

From its experience in obtaining the use of cash collateral over the lenders' objection in the *Beker* case, [*In re Beker Industries, Corp.,* 58 B.R. 725 (Bankr.S. D.N.Y.1986)] Kronish, Lieb determined that, in all likelihood, it could file a motion and conduct a trial in the Bankruptcy Court which would result in an authorization to use cash collateral despite objection from CNA. Even though Kronish, Lieb already had prepared the cash collateral motion that was ready for filing, the firm determined that filing the motion was not in the best interest of creditors of the estate. Specifically,

Washington did not seem to have a viable business plan that would have returned the company to economic health. On the other hand, the facts seem to indicate that using cash collateral to continue operations would have resulted in staggering losses and the ultimate, total collapse of the company. Cognizant of its responsibilities to all creditors (including CNA), Kronish, Lieb advised management not to pursue the continuation of operations on a full scale basis.

Many reorganizations fail and many debtors terminate operations after several months in chapter 11. Through its experience, Kronish, Lieb was able to see into the future and advise an early termination of operations. The result of Kronish, Lieb's advice was the savings of millions of dollars that would have been lost if operations had continued even for a few weeks.

This position is reiterated at page 29 of the February 10, 1989 Memorandum,

[i]n the Washington case, the orthodox strategy would have been to make a knee-jerk motion for cash collateral. But, Kronish, Lieb made a calculated decision *not* to obtain the order. Not accepting representations of fact at face value, Kronish, Lieb discovered after extensive work that the debtor was literally incapable of operating. In short, there was no structure to support a cash infusion. The firm made a hard decision that was in the long-term best interest of the estate.

From these statements, it appears that Kronish, Lieb's efforts were not directed at obtaining a cash collateral order but, rather, at determining what the debtors' circumstances actually were and making good faith recommendations based on those determinations.

While the Court agrees that a cash collateral order has been necessary in these cases and that the Trustee and his counsel performed admirably in procuring such, it cannot conclude that Kronish, Lieb's services resulted in no benefit to the estate because such an order was not immediately pursued. Rather, the Court is favorably impressed that Kronish, Lieb did not burden the Court, estate and creditors with wasteful pleadings and hearings. Kronish, Lieb's strategic decisions should not be penalized by deprivation of fees. If the time spent by Kronish, Lieb were excessive, the Court would not hesitate to reduce the total fee award. *See, e.g., In re Crabtree,* 45 B.R. 463 (Bankr.E.D.Tenn.1984). However, excessiveness is relative to the total circumstances of each case, and this Court does not find excessiveness simply because $60,482.00 is requested for post-petition services or because those fees were generated over a relatively short period of time.[5] Most of the firm's post-petition work was performed in the time-demanding critical period just after the chapter 11 filing.

The Court has considered the amount of time in light of what was occurring at the time.[6] In retrospect, it appears to the Court that perhaps the most significant and beneficial undertaking in these cases, aside from the chapter 11 filings, was the appointment of Mr. Timothy Finley as case trustee. This was initiated by Kronish, Lieb in that it was Kronish, Lieb attorneys who convinced management of the need for such and so moved the Court. Further, Kronish, Lieb's early strategic decisions appear to have saved the estate considerable expense.

Moreover, the time records submitted by Kronish, Lieb, the memoranda filed, the testimony at the hearing on this matter, and the statements of counsel reflect that Kronish, Lieb worked to protect the estate's assets in their communications with creditors, both secured and unsecured; in their representation of the debtors in labor negotiations and in a temporary restraining order action filed by the U.S. Department of Labor; and in their representation of the debtors in defense of a manager trainee who was criminally charged and arrested in

---

5. The Court has compared Kronish, Lieb's application to those applications, previously approved, on behalf of the Trustee's counsel.

6. "Hard choices in difficult situations demand adequate compensation." Kronish, Lieb's *Rebuttal Memorandum,* p. 24.

Kentucky for the debtors' failure to pay pre-petition wages.

■■■ The Court is not inclined to engage in overly critical retrospection "or to 'second guess' actions and decisions undertaken by attorneys in good faith as the situation appeared to them at the time such actions or decisions were necessary." *Public Service*, 86 B.R. at 12. Rather, the Court is inclined to determine any benefit, or lack thereof, to the estate based upon a totality of circumstances. The following observation, in pertinent part, by Judge Yacos in his *Public Service Co. of New Hampshire* opinion, *Id.*, has application here.

> The Court is well aware of the uncertain world of fact and law in which the reorganization lawyer must dwell under the pressure of time and expense of moving forward ... It is a shadowy realm of incomplete facts and unformed legal issues that must be mastered quickly under manifold time pressures. What seems crystal clear and simple in hindsight ... is seldom presented as such in the heat of battle. However, in the last analysis, final fee awards necessarily must take into account all the circumstances of a particular case.

Taking into account all the circumstances of these cases, the Court finds that the services rendered by Kronish, Lieb were of significant benefit to the estate. Consequently, the Court is satisfied that no reduction in the overall fee request is necessary and that the request is reasonable within the meaning of § 330(a).[7]

## EXPENSES

In addition to compensation for services rendered, Kronish, Lieb seeks reimbursement of expenses in the amount of $20,-371.05. Specifically, reimbursement is requested for: meals, $248.55; local transportation, $648.00; telephone and telegrams, $715.09; photocopies, $479.00; secretarial overtime, $238.00; postage, $16.08; travel, $4,747.07; filing fees, $120.00;

court reporting, $187.60; word processing, $2,407.99; messenger services, $158.50; courier services, $25.75; proofreading, $93.24; Westlaw and Lexis, $348.75; and Kalliste Corporation, $9,937.36.

Of these expense items, "Kalliste Corp." and "word processing" are objected to by the U.S. Trustee, the Chapter 11 Trustee, and the Unsecured Creditor's Committee. The Chapter 11 Trustee additionally objects to "secretarial overtime" while the Unsecured Creditors' Committee additionally objects to "excessive travel." The U.S. Trustee additionally objects to "secretarial overtime," "messenger service," "courier service," and "proofreading" along with "word processing" as "nonreimbursable, overhead expenses." Moreover, the U.S. Trustee asserts in a memorandum of law filed January 6, 1989, that reimbursement for the expenses of "meals, local transport, travel, filing fees, and court reporting" should be denied because insufficient detail to determine the reasonableness or necessity is provided in the application.

The gist of the objections raised to reimbursement for the Kalliste Corporation expense is that the services for which Kalliste Corporation seeks to be paid were professional services performed without authorization of the court pursuant to § 327.

Section 330(a)(2) of the Code authorizes the court to award to professionals "reimbursement for actual, necessary expenses." In applying this section, the courts generally require that the expenses incurred were actually necessary for the proper representation of the particular client from whom reimbursement is sought. *See, e.g., In re National Paragon Corp.*, 76 B.R. 73 (E.D. Pa.1987); *In re Wildman*, 72 B.R. 700 (Bankr.N.D.Ill.1987). Moreover, the expense, in order to be reimbursable, must be incurred by a "professional person employed under section 327 or 1103." 11 U.S.C. § 330(a). As with the award of fees for services, this reimbursement of expenses is entitled to be paid as an adminis-

---

7. Kronish, Lieb carried its "burden of proof as to the entitlement to and reasonableness of the fees sought." *In re Four Star Terminals, Inc.*, 42

B.R. 419, 429, 12 B.C.D. 197, 11 C.B.C.2d 47 (Bankr.D.Alaska 1984).

trative expense priority. 11 U.S.C. § 503(b)(2); § 507(a)(1).

## KALLISTE CORPORATION

■ Turning first to the issue of the Kalliste Corporation (hereinafter "Kalliste") expense, it is the Court's initial determination that compensation for Kalliste is not allowable as an expense claim of Kronish, Lieb given the very language of § 330(a) and the circumstances here. As quoted above, the statute provides that the Court may award to duly employed professionals "reimbursement for *actual*, necessary expenses." 11 U.S.C. § 330(a)(2). (Emphasis added) The evidence here does not support and in fact is contrary to a finding that Kalliste's claim is or was an *actual* expense of the Kronish, Lieb firm. According to the Memorandum of Law submitted by Kronish, Lieb, on February 10, 1989,

> [t]here is no agreement between Kalliste or Kronish, Lieb to share or pay any compensation with or to Kalliste. Having brought Kalliste into the case, Kronish, Lieb has a moral obligation to ask the Court's authorization to compensate Kalliste.

p. 49, n. 25.

In light of this statement, the Court must conclude that the compensation claim of Kalliste is not an "actual" expense of Kronish, Lieb. *See, e.g., In re Midland Capital Corp.*, 82 B.R. 233, 241 (Bankr.S. D.N.Y.1988). Obviously, the opposite conclusion could potentially result in a finding that § 504 of the Code, which prohibits fee sharing, had been violated.

Having made this determination, the question becomes whether Kalliste is entitled to payment of its claim for compensation as an administrative expense. Section 507 of the Code establishes the priority for payment of claims in a bankruptcy case. Pursuant thereto, first priority is given, *inter alia*, to claims which qualify as "administrative expenses" under § 503(b). For our purposes, the pertinent provisions of § 503(b) are (1)(A) and (2) which state:

> (b) [a]fter notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under section

502(f) [involuntary gap] of this title, including—

> (1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered *after* the commencement of the case:
>
> (2) compensation and reimbursement awarded under section 330(a) of this title. (Emphasis added.)

This language coupled with the Court's earlier determination that Kalliste's claim is not reimbursable as an actual expense clearly call for a determination whether Kalliste's claim constitutes an actual, necessary cost of preserving the estate arising after commencement of the case or an award of compensation and reimbursement under § 330(a).

■ From the facts presented, there is no apparent dispute as to whether Kalliste actually performed the services for which compensation is sought, nor does there appear to be any dispute that the services, except for one and one-half days, were performed prepetition. Moreover, it is clear that no court approval for Kalliste's employment was sought or obtained. According to the Memoranda filed in this proceeding and the statements of counsel at the hearing on this matter, because the debtors' major secured creditor would not agree to provide a retainer for payment of Kalliste's services, Kalliste performed no services after the day following the filing of the chapter 11 petitions. Consequently, there was not enough time to obtain court authorization for their employment. However, according to the statement of counsel and testimony of Mr. Rochelle, even if there had been time, such authorization was not necessary because the principals of Kalliste had been appointed Chief Executive Officer and Chief Financial Officer of the debtor corporations by their Board of Directors.

As discussed above, compensation is awarded pursuant to § 330(a) only to those individuals and entities "employed under section 327 or 1103" of the Code. 11 U.S.C. § 330(a). Because Kalliste was not employed under either of these sections, its

claim clearly does not qualify as an award of compensation under § 330(a) and therefore does not qualify as an administrative expense claim pursuant to § 503(b)(2).

Next, the Court must consider whether Kalliste's claim qualifies as an administrative expense pursuant to § 503(b)(1)(A). In order to do so, it must constitute an actual and necessary expense of preserving the estate and be for services rendered after the commencement of the case. According to the Sixth Circuit Court of Appeals,

> [t]he test for whether a claim qualifies for payment as an administrative expense is set forth in *In re Mammoth Mart, Inc.*, 536 F.2d 950 (1st Cir.1976). In *Mammoth Mart*, the Court stated that a claimant must prove the debt (1) arose from a transaction with the debtor-in-possession as opposed to the preceding entity (or, alternatively, that the claimant gave consideration to the debtor-in-possession); and (2) directly and substantially benefited the estate. *Id.* at 954.

*In re White Motor Corporation*, 831 F.2d 106, 110, 17 C.B.C.2d 1077 (6th Cir.1987). In the *White Motor* case, a creditor asserted that his claim for post-petition expenses which arose from a pre-petition obligation to the debtor were entitled to administrative expense priority under § 503(b)(1)(A). The Court disagreed and in so holding reasoned that the general policy of the Bankruptcy Code is to distribute all assets equitably, and priority may only be granted pursuant to this policy. *Id.* at 110. Moreover, that Court concluded that the purpose of § 503 plainly requires that the claims of third parties who are induced to supply services to the debtor-in-possession be afforded priority. *Id.*, citing *In re Jartran, Inc.*, 732 F.2d 584, 586, 11 B.C.D. 1181, 10 C.B.C.2d 1069 (7th Cir.1984).

 In the proceeding *sub judice* it is clear that Kalliste was employed by the prepetition debtors, and it is equally clear that the majority of the services performed for these debtors were performed prepeti-

tion. Therefore, to the extent that its claim is for prepetition services contracted by the prepetition debtors, it does not qualify as an administrative expense claim pursuant to § 503(b)(1)(A). Thus, the only potential for Kalliste's prepetition claim to be classified as an administrative one lies with the possibility that it can be shown to at least partially be comprised of "wages, salaries, or commissions for services rendered after commencement of the case."[8]

 This of course brings us to the issue of whether the services performed by Kalliste may be classified as the services of newly appointed management or as the services of "professionals" acting without requisite Court authorization. In a recent decision by the Honorable Leif M. Clark, Bankruptcy Judge for the Western District of Texas, the following passage was relied upon for a determination of whether a consultant employed by a case trustee should be compensated as a nonprofessional or as a professional. That Court concluded that the consultant was a professional within the meaning of § 327:

> Persons who offer services normally performed by professionals, such as appraisals or management consultants, have been designated as professionals, while persons who are involved in the mechanics of a debtor's business have been found not to be within that category of persons. *In re Carolina Sales Corp.*, 45 B.R. 750 (Bankr.E.D.N.C.1985); *U.S. ex rel. Kraft v. Aetna Casualty & Surety Co.*, 43 B.R. 119 (M.D.Tenn.1984). Factors considered by the courts involve not only the nature of the services performed, but also the effect of such person's services upon the administration of the bankruptcy case and how central that role is to the reorganization proceedings. [citations omitted.] If the person seeking to be appointed ... actually impacts on the administration of the debtor's estate, that person may be a professional person regardless of the label to its [sic]

---

**8.** Even if it can be shown that Kalliste Corporation was in essence an employee of the debtor rather than a professional and thus entitled to compensation as such, its claim for prepetition management activities would at best qualify as an unsecured claim entitled to priority pursuant to § 507(a)(3).

function. *In re Johns Manville Corp.,* 60 B.R. 612, 620 (Bankr.S.D.N.Y.1986). *In re Aladdin Petroleum Co.,* 85 B.R. 738, 740, 17 B.C.D. 771 (Bankr.W.D.Tex.1988).

In the instant proceeding, Kalliste would have the Court believe that although it acted as management consultants, and thus "designated professionals" pursuant to the above cited passage, the employees of Kalliste were also "involved in the mechanics of [the] debtor's business" once Kalliste was appointed by the Board of Directors. In support of this contention, Mr. Rochelle and Mr. Costich testified that the Board of Directors of the debtor corporations appointed Mr. Costich and Mr. Ris Chief Executive Officer and Chief Financial Officer immediately preceding the chapter 11 filings. Mr. Rochelle further testified that the appointment was made on February 29, 1988. (The Chapter 11 petitions were filed on March 1, 1988). In addition, the "time sheets" of the employees of Kalliste were submitted as an exhibit at the September 7, 1988 hearing on this matter. These records reflect a total of 142 hours of services performed by four individuals between February 28 and March 4, 1988. Although no proof was made of a Board resolution appointing Kalliste as the new management team per se, both Mr. Ris and Mr. Costich include time entries on March 1 and 2, respectively, which involve developing plans for and discussing "management transition." Mr. MacLean, Nashville counsel for the debtors' primary secured creditor, Citicorp, testified that on March 1, 1988 (the date the petition was filed) he understood that the "Kalliste Group" had been appointed to "run the company." He further testified; however, that on March 2, he was told that Mr. Costich and Mr. Ris had never accepted positions as managers of the company. Moreover, according to Mr. MacLean, Kalliste demanded a $50,-000.00 retainer at the outset without which it would not assume management of the debtors. Citicorp would not agree to the retainer absent a proposed budget and projections. Upon cross-examination, although he insisted they were later appointed to management positions, Mr. Costich testified that when he and his associates

"came to Nashville on Sunday [February 28], they were consultants." This conclusion is supported by the testimony of the Chapter 11 Trustee, Mr. Finley, himself a consultant, who reviewed the Kalliste bill and its attached description of services and found the bill to be one for consulting services.

In considering the evidence and testimony presented, the Court recognizes that Kalliste performed substantial services for these debtors and although the Court is reluctant to deny compensation for such an obvious expense, it cannot ignore the fact that regardless of the "label" or purported appointed position, Kalliste Corporation is a professional organization engaged in the business of providing business and financial consultation to financially distressed businesses. As such, it is subject to the requirements of § 327. In a situation such as this, the Court is "tempted to make a pragmatic finding of 'no harm—no foul,' then to enter an order sanctioning the services after the fact. To succumb to such a temptation however invites circumvention of section 327." *In re Aladdin Petroleum Co.,* 85 B.R. at 740. Although it is well settled that the Bankruptcy Court is a court of equity, its equitable powers may only be exercised "within the confines of the Bankruptcy Code." *In re G. Weeks Securities, Inc.,* 89 B.R. 697, 713, 18 B.C.D. 162, 19 C.B.C.2d 737 (Bankr.W.D.Tenn. 1988), quoting *Norwest Bank Worthington v. Ahlers,* 485 U.S. 197, 108 S.Ct. 963, 968–69, 99 L.Ed.2d 169 (1988). Under these circumstances, exercise of the Court's equitable powers would contravene the clear requirements of the Code. Therefore, Kalliste will be permitted to file a general unsecured claim for its compensation and reimbursement but Kalliste's claim may not be paid as an administrative expense along with Kronish, Lieb's expenses.

OTHER EXPENSES

With respect to Kronish, Lieb's remaining expense claims, the Court is satisfied that they have been adequately documented. This is so particularly in light of the detailed statement submitted on February 10, 1989, subsequent to the U.S. Trustee's

comments filed on January 6, 1989. *See, e.g., In re Crabtree,* 45 B.R. 463 (Bankr.E.D.Tenn.1984); *In re Cumberland Bolt & Screw,* 44 B.R. 915 (Bankr.M.D.Tenn.1984). Moreover, the Court is satisfied that most of these expenses were actual and reasonably necessary. *In re National Paragon Corp., supra.* However, the Court will address the gravamen of the objections raised by the parties in interest here that although "actual and necessary," several of the expenses for which reimbursement is sought constitute "overhead."

Previously allowed to other counsel in this case, without serious objection, have been reimbursements for mileage, long distance telephone charges, courier services, photocopies, extraordinary postage, telecopy charges and travel. In addition, court reporter charges which are customarily attributable to a particular client have been allowed by this Court, as have filing fees. Expenses incurred for meals while travelling for a particular client, if reasonable in amount, also warrant reimbursement. *In re Kreidle,* 85 B.R. 573 (Bankr.D.Colo. 1988); *In re Prairie Central Ry. Co.,* 87 B.R. 952 (Bankr.N.D.Ill.1988); *In re Wildman, supra.* The Court is satisfied that the reimbursement sought for these items by the present application are reasonable.

■ As to the charges for computer research services, this Court finds the charges to be reasonable and compensable. *In re UNR Industries, Inc.,* 72 B.R. 796, 801–02 (Bankr.N.D.Ill.1987). Like the other expenses discussed in the preceding paragraph, the Court is familiar with the established practice of attorneys' charging for computer research to the affected client. *In re Wildman,* 72 B.R. at 732. These charges are allowed. *But see contra, In re Cuisine Magazine, Inc.,* 61 B.R. 210, 218 (Bankr.S.D.N.Y.1986).

■ The U.S. Trustee objects to Kronish, Lieb's request for "proofreading" expenses of $93.24 as a nonreimbursable overhead expense. This objection has been countered by Kronish, Lieb's explanation that the firm employs individuals to act as proofreaders at the rate of $22.00 per hour. The idea, according to Kronish, Lieb, is to provide the service to specific clients in need of proofreading services and accordingly "bill them" at those rates rather than at more expensive attorney rates. In addition, the use of "proofreaders" allows the attorneys more time for attention to more important matters. With this explanation, Kronish, Lieb has described a "practice" of billing specific clients for this particular service. *In re Prairie Central Ry. Co., supra; In re Wildman, supra.* Moreover, such a practice demonstrates a significant savings to the estate when the hourly rate of proofreaders are compared to those of the attorneys. Such economy should not be thwarted despite the fact that the proofreading time was obviously small. The expense claims for secretarial overtime and word processing also are objected to as "overhead expense" items. Again, Kronish, Lieb has responded that these items are reserved for and billed to the particular clients who need such services. Notwithstanding this response, and the apparent split in authority on the issue, the Court is inclined to follow the precedent established in this district that such items as proofreading, secretarial overtime and word processing are nonreimbursable overhead expenses. *See, e.g., In re Westwood Asphalt Paving, Inc.,* 45 B.R. 111 (Bankr.E.D.Mich. 1984) (Paine, J., sitting by designation); *In re Cumberland Bolt & Screw, Inc.,* 44 B.R. at 917; *see also In re Bonds Lucky Foods, Inc. No. 1,* 76 B.R. 664 (Bankr.E.D. Ark.1986); *In re Command Services Corp.,* 85 B.R. 230, 20 C.B.C.2d 287 (Bankr. N.D.N.Y.1988). *But see, contra, In re Kreidle, supra; In re First Software Corp.,* 79 B.R. 108 (Bankr.D.Mass 1987); *In re UNR Industries, Inc.,* 72 B.R. at 802.

■ The distinction between allowing reimbursement of expenses for copies, extraordinary postage, travel, telephone or courier, and disallowing overhead such as secretarial overtime, proofreading or word processing is an admittedly fine line. But a rational distinction does exist. The Court understands and appreciates the argument that all of these "expenses" are intended by the law firm to be borne by its clients. *See, e.g., In re Gulf Consolidated Servic-*

*Inc.,* 91 B.R. at 415. Also, the Court appreciates Kronish, Lieb's argument that disallowance may result in law firms' increasing the hourly rate charged by attorneys. However, at least in this Court's experience, secretarial overtime, proofreading and word processing charges have not been shown to be customarily charged to clients. Further, no proof was put before the Court that these expenses are customarily charged to clients as a general practice by law firms or other professionals. On the other hand, this Court has routinely observed practitioners charge for copying, telephone, extraordinary (as opposed to routine) postage, travel, computer research and delivery expenses. As stated, this Court has approved the latter expenses in this case for the Trustee's counsel. Before this Court will begin to approve secretarial overtime, proofreading and word processing expenses as non-overhead items, the applicant must carry the burden of proof. 11 U.S.C. § 330(a); *In re S.T.N. Enterprises, Inc.,* 70 B.R. at 832. Kronish, Lieb put forth no proof other than its firm policy. This Court would require proof of at least a local, if not regional, practice of professionals, both in bankruptcy and other fields. In addressing photocopying, postage and travel, one court distinguished those expenses from overhead "because they are incurred on behalf of a particular client, and accordingly, have *traditionally* been expenses which are billed to that client." *In re National Paragon Corp.,* 76 B.R. at 74. (Emphasis added). Kronish, Lieb relies upon its billing to a particular client. The Court recognizes that a *tradition* must begin somewhere but it may not begin in this Court without proof that there is a justification for the birth of a tradition. The Court has no doubt that billing for secretarial overtime, proofreading or word processing is traditional at Kronish, Lieb. But proof must demonstrate that it is an accepted professional practice. *Compare, In re Cuisine Magazine, Inc.,* 61 B.R. at 218 ("A bald assertion that the billing of staff overtime is [a] 'standard practice' was not adequate.").

Moreover, based on the hourly rates of the applicants here, as compared to Nash-ville "local rates," the Court is satisfied that they are sufficient to cover secretarial overtime, proofreading or word processing items as overhead expenses of the applicants. *See e.g., In re Kreidle, supra.*

From the above findings and conclusions, IT IS HEREBY ORDERED that:

1. The request for compensation is granted in its entirety, $60,482.00, after a voluntary reduction of $3,500.00 for travel time.

2. The expense claims for meals, local transportation, telephone, telegrams, photocopies, postage, travel, filing fees, court reporting, messenger and courier services, and computer research are allowed.

3. The expense claims for secretarial overtime, word processing, proofreading and Kalliste Corporation are denied.

SO ORDERED.