**In re SOUTHERN INDUSTRIAL BANKING CORPORATION, d/b/a Daveco, Debtor.**

**Bankruptcy No. 3–83–00372.**

United States Bankruptcy Court, E.D. Tennessee.

July 16, 1984.

Frantz, McConnell & Seymour, Arthur G. Seymour, Sr., E. Bruce Foster, Jr., Knoxville, Tenn., for trustee.

Smith, Cohen, Ringel, Kohler & Martin, Michael S. Haber, Atlanta, Ga., Lockridge & Becker, James A. McIntosh, Knoxville, Tenn., for debtor.

Bernstein, Susano, Stair & Cohen, Bernard E. Bernstein, J. Thomas Jones, Knoxville, Tenn., for Creditors' Committee.

Irwin A. Deutscher, Nashville, Tenn., trustee.

Benesch, Friedlander, Coplan & Aronoff, Howard Sokolsky, H. Jeffrey Schwartzberg, Cleveland, Ohio, Caplin & Drysdale, Robert E. Mannion, Washington, D.C., for investors.

Dearborn & Ewing, James R. Kelley, Nashville, Tenn., for East Tennessee Bancorp, Inc.

Hunton & Williams, John A. Lucas, Knoxville, Tenn., for Bank of Commerce and East Tennessee Bancorp, Inc.

K. Rodney May, Washington, D.C., for Securities & Exchange Commission.

Dr. Roland E. Duncan, Creditor, pro se.

Peggy Golliher, Creditor, pro se.

Janet Ritter, Creditor, pro se.

## MEMORANDUM ON APPLICATIONS FOR COMPENSATION BY ATTORNEYS AND ACCOUNTANTS FOR THE INVESTORS

CLIVE W. BARE, Bankruptcy Judge.

At issue is the reasonableness of accountant and attorney fees incurred by an investor group for services in connection with the debtor's chapter 11 plan. Because postconfirmation payment is sought from assets of the debtor's successor in interest, which has issued securities and acquired property under the reorganization plan, applicants seek court approval of their fees as reasonable, 11 U.S.C.A. § 1129(a)(4)(B)(ii) (1979).

I

Southern Industrial Banking Corporation (SIBC), an industrial loan and thrift institution, was principally engaged in the busi-

ness of making loans and obtaining capital through the sale of unsecured, uninsured investment certificates when it filed a chapter 11 petition on March 10, 1983. SIBC continued as a debtor in possession only until April 18, 1983, when the court ordered the appointment of a trustee due to gross mismanagement of the affairs of SIBC by its current management. 11 U.S.C.A. § 1104(a)(1) (1979). Although the scheduled value of the SIBC assets is $48,890,-936.50, after investigation the trustee reported the net liquidation value of assets was only $30,403,677.74, an amount substantially less than the $51,302,449.91 in reported liabilities. Approximately $50,-000,000 of the liabilities scheduled represented "investment certificates" and "passbook savings," owing to nearly 5,800 creditors.

In July 1983, Frank Cihak met with the trustee to discuss the acquisition of SIBC by an investor group he represented.[1] Previous to this meeting, on or about June 17, 1983, the investor group retained Peat, Marwick, Mitchell & Co. (Peat Marwick) to examine both the feasibility of acquiring certain state-chartered Tennessee banks and the reorganization of SIBC. On or about September 9, 1983, the investor group retained Benesch, Friedlander, Coplan & Aronoff (Benesch), a law firm in Cleveland, Ohio, to represent the investor's objective of acquiring both SIBC and two existing banks, also located in East Tennessee, whose deposits, unlike those of SIBC, were insured by the Federal Deposit Insurance Corporation (FDIC). On October 3, 1983, a disclosure statement and a plan for reorganization of SIBC, formulated and prepared by Benesch, were filed with the court. Thereafter, two additional law firms were also retained by the investor group. Dearborn & Ewing of Nashville, Tennessee, was retained to assist in the investor's organization of East Tennessee Bancorp, Inc., a bank holding company. Caplin & Drysdale, of Washington, D.C., agreed to serve as special bank counsel representing the investor group in negotiations with both FDIC and the Federal Reserve Board.

On October 28, 1983, the court found that the SIBC disclosure statement, as amended, contained adequate information to enable a reasonable investor typical of the holders of claims or interests to make an informed judgment about the SIBC plan. 11 U.S.C.A. § 1125(a)(1) (1979). A modified plan was conditionally confirmed on November 28, 1983, but the effective date of confirmation was postponed to afford the trustee and the investor group opportunity to fulfill certain conditions precedent, including obtaining necessary regulatory approvals, to their respective performance under the reorganization plan. Upon the representations of the trustee and the attorneys for the investor group that all conditions precedent had been either fulfilled or waived, an order was entered establishing January 20, 1984, as the effective date of confirmation.

Generally, the confirmed plan provides for:

(1) the creation of East Tennessee Bancorp, Inc., a bank holding company, with a capital infusion of not less than $3,000,000 by the investor group;

(2) acquisition of the Bank of Commerce of Morristown by East Tennessee Bancorp, Inc.;

(3) transfer to a liquidating trust of certain contingent assets of SIBC, consisting of approximately $26,000,000 in commercial loans of doubtful collectibility and the trustee's causes of action to recover preferential transfers and fraudulent conveyances;

(4) merger of SIBC, with all its remaining assets, and the Bank of Commerce of Morristown; and

(5) issuance to SIBC creditors of cash, FDIC-insured certificates of deposit, contingent interest certificates of participation in the liquidating trust,[2]

---

1. This investor group consists of sixteen individuals, including Cihak, a corporation, and a trust.

2. Proceeds from the collection of commercial loans to the extent of $5,000,000 are appropria-

preferred stock in East Tennessee Bancorp, and warrants to purchase East Tennessee Bancorp common stock.

FDIC approved the proposed merger of SIBC and the Bank of Commerce of Morristown on January 18, 1984.[3] In consideration of FDIC approval the investor group, acting through East Tennessee Bancorp, agreed to make a capital infusion of at least $4,300,000 in the resultant bank, Bank of Commerce, and to assume a $600,000 obligation of the Bank of Commerce of Morristown. The merger was consummated on January 30, 1984.

General creditors of SIBC received different consideration pursuant to the confirmed plan, dependent upon the amount of their claim. Approximately one-third of these creditors, those with claims exceeding $5001, received a package consisting of a ten-year federally insured variable rate certificate of the Bank of Commerce (for 30 percent of their claim), a certificate of interest in the SIBC liquidation trust (for 54 percent of their claim), shares of convertible preferred stock in East Tennessee Bancorp (for 16 percent of their claim), and warrants to purchase East Tennessee Bancorp common stock.

## II

The following fee applications requesting court approval, pursuant to 11 U.S.C.A. § 1129(a)(4)(B)(ii) (1979), have been filed:

| Applicant | Hours Expended | Fee Requested | Expenses | Total Compensation |
|---|---|---|---|---|
| Benesch | 3,300.75 | $328,817.50 | $23,623.71 | $352,441.21 |
| Caplin & Drysdale | 145.7 | 26,870.50 | 2,207.25 | 29,077.75 |
| Dearborn & Ewing | 321.45 | 31,415.50 | 5,271.05 | 36,686.55 |
| Peat Marwick | 724 | 93,635.00 | 10,755.00 | 104,390.00 |

Each application includes attachments reciting the services performed. The applications of the three law firms also include a statement of the customary hourly rate charged for the services of each attorney involved. Further, all four applicants assert that from the inception of their retention they expected their fees and expenses to be paid by East Tennessee Bancorp, as organizational expenses, provided that the SIBC reorganization plan was confirmed.

Frank Cihak, spokesman for the investor group and president of the Bank of Commerce, testified at the hearing on the four applications before the court. Cihak, as an investor, has been involved in six different successful bank acquisitions. According to his testimony, he and his co-investors in previous bank acquisitions have treated accountant and attorney fees incurred in the acquisition process as organizational expenses. Cihak further testified that organizational expenses, such as the accountant and attorney fees requested by the applicants, are generally paid with capital funds invested in the bank holding company purchasing the acquired bank.

Glenn Hodges, chairman of the SIBC creditors' committee, orally objected to payment of the requested fees from funds of East Tennessee Bancorp because this would diminish the value of the stock (in East Tennessee Bancorp) issued to SIBC creditors under the confirmed plan. Hodges stated that the creditors' committee felt the investor group should pay the fees sought. He further stated that the investor group never explained to the creditors'

ble to a reserve fund to complement the capital requirements of the SIBC successor in interest. Recoveries attributable to the avoidance of fraudulent transfers and preferences are payable to the successor in interest.

3. The investor group's original proposal, merger of SIBC with two existing FDIC-regulated banks, was modified when the investors withdrew their plan to acquire City and County Bank of Jefferson County.

committee that these fees would be paid from assets of the SIBC successor in interest.

Cihak concedes that prior to confirmation the investor group never discussed with either the creditors' committee or the trustee the fact that the investors intended to pay the accountant and attorney fees at issue with East Tennessee Bancorp funds. However, he contends there was no secret about the expected source of payment. Indeed, Cihak points out that the projected income statement of East Tennessee Bancorp, an exhibit to the SIBC amended disclosure statement included in the printed material mailed to all scheduled creditors, reflects organizational costs of $100,000 per annum for a six-year period.[4] According to Cihak, the fees in question represent these previously projected organizational costs. The adequacy of this disclosure—disclosure being a prerequisite to confirmation of the debtor's plan—is not at issue.

### III

Section 1129(a)(4) of Title 11 of the United States Code enacts:

*Confirmation of plan*

(a) The court shall confirm a plan only if all of the following requirements are met:

 . . . .

(4)(A) Any payment made or promised by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in, or in connection with, the case, or in connection with the plan and incident to the case, has been disclosed to the court; and

**4.** Cihak testified that the amortization of $600,000 in organizational expenses did not necessarily mean that these expenses would not be paid "up front."

**5.** This section provided: *"Confirmation by court* —The judge shall confirm a plan if satisfied that—

 . . . . .

(4) all payments made or promised by the debtor or by a corporation issuing securities or acquiring property under the plan or by

(B)(i) any such payment made before confirmation of the plan is reasonable; or

(ii) if such payment is to be fixed after confirmation of the plan, such payment is subject to the approval of the court as reasonable.

This provision is nearly identical to § 221(4) of the Bankruptcy Act of 1898,[5] which was designed to "eliminate the practice of fixing reorganization fees and expenses by private arrangement, thereby decreasing the effective amount of recovery of the creditors." *In re P–R Holding Corp.*, 147 F.2d 895, 899 (2d Cir.1945). *See also* 6A *Collier on Bankruptcy* ¶ 11.09, 245 (14th ed. 1977): "Section 221(4) ... is one of the many protective measures of Chapter X designed to afford a comprehensive judicial supervision of all compensation and expenses in reorganization cases." (Footnote omitted.) Code § 1129(a)(4) maintains the protection formerly afforded under § 221(4).

 The bankruptcy court had exclusive jurisdiction to assess the reasonableness of fees and expenses within the scope of § 221(4) of the former Bankruptcy Act. *Brown v. Gerdes,* 321 U.S. 178, 64 S.Ct. 487, 88 L.Ed. 659 (1944). This jurisdiction continues under the Code with respect to fee applications for services rendered "in, or in connection with, the case, or in connection with the plan and incident to the case." 11 U.S.C.A. § 1129(a)(4) (1979). Review by the bankruptcy court of the reasonableness of fees and expenses within the scope of Code § 1129(a)(4) is not limited to fees and allowances payable from assets of the debtor's estate. *See Leiman v. Guttman,* 336 U.S. 1, 69 S.Ct. 371, 93 L.Ed.

any other person, for services and for costs and expenses in, or in connection with, the proceeding or in connection with the plan and incident to the reorganization, have been fully disclosed to the judge and are reasonable or, if to be fixed after confirmation of the plan, will be subject to the approval of the judge ...." 11 U.S.C.A. § 621(4) (1970), *repealed by* Bankruptcy Reform Act of 1978, 92 Stat. 2549, 2635.

453 (1949) (bankruptcy court has exclusive jurisdiction to pass on reasonableness of claim for attorney services rendered for protective committee in a reorganization proceeding); *In re Int'l Power Securities Corp.*, 119 F.Supp. 31 (D.N.J.1954) (review of reasonableness of fees requested by indenture trustee from funds made available by a third party pursuant to a proposed settlement integral to the debtor's plan of reorganization). Because the applicants seek payment for services rendered in connection with the debtor's plan, or incident to the debtor's case, this court clearly has jurisdiction to rule on the reasonableness of the payments sought, even though the source of payment is a bank holding company, not the debtor's estate.[6] 11 U.S.C.A. § 1129(a)(4)(B)(ii) (1979).

## IV

The applicants maintain that the only interest of the SIBC estate to be protected is "ensuring that securities issued by East Tennessee [Bancorp, Inc.] under the plan are not improperly diminished in value through excessive or unsupportable payments" made pursuant to Code § 1129(a)(4). Observing there is no authority articulating the criteria composing the standard of "reasonableness" to be applied to requests within Code § 1129(a)(4), applicants assert their fee requests are reasonable *per se*. Their assertion is based on the fact that the aggregate compensation for which approval is sought, approximately $533,000, is less than the organizational costs of $600,000 projected for East Tennessee Bancorp by Cihak. Also, applicants contend that no interested party has disputed the time spent in performance of their services, their customary billing rates, or the beneficial result obtained for SIBC creditors. Further, applicants maintain the standard of reasonableness based on the facts set forth in 11 U.S.C.A. § 330(a) (1979)[7] is inapposite because Code § 330 explicitly applies only to trustees, examiners, professional persons employed by either a trustee or an official committee of creditors or equity security holders, and the debtor's attorney. However, applicants alternatively contend that their fee requests are reasonable even if "reasonableness" under Code § 1129(a)(4)(B)(ii) is gauged by the factors in Code § 330.

The Securities and Exchange Commission (SEC), which has participated in this case since its commencement, 11 U.S.C.A. § 1109(a) (1979), has filed a brief on the question of this court's jurisdiction to review the instant fee applications and the appropriate elements to determine reasonableness under Code § 1129(a)(4). Although concurring in applicants' belief that jurisdiction exists and court approval of their fee applications is required by Code § 1129(a)(4), the SEC urges the court to reject the *per se* standard proposed by the applicants. Maintaining the services performed by applicants are ordinarily performed by attorneys for either a debtor in possession or a trustee and that the purpose of Code § 1129(a)(4) is similar to that of Code § 330, the SEC argues the factors to determine reasonableness set forth in Code § 330—time expended, nature, extent and value of professional services, and the cost of comparable services in a nonbankruptcy case—are likewise applicable to requests for approval pursuant to Code § 1129(a)(4)(B)(ii). Further, the SEC contends that incongruous results will occur if

---

**6.** See note 8, *infra.*

**7.** *Compensation of officers*

 (a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a trustee, to an examiner, to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

 (1) reasonable compensation for actual, necessary services rendered by such trustee, examiner, professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such trustee, professional person, or attorney, as the case may be, based on the time, the nature, the extent, and the value of such services, and the cost of comparable services other than in a case under this title; and

 (2) reimbursement for actual, necessary expenses.

the same standard is not applied, since fees for similar services, though disallowed under Code § 330, could go unchallenged when paid from a source other than the estate, even though payment may nonetheless affect the return to creditors. No position, however, is taken by the SEC with respect to the reasonableness of the payments sought by the applicants.

■ Code § 1129(a)(4)(B)(ii) explicitly requires the court to determine the reasonableness of the payments sought by the applicants. This duty exists even in the absence of any challenge or objection to an applicant's request for approval.[8] A common sense approach dictates that "reasonableness" cannot be ascertained without reference to the time required to perform the services for which payment is requested, the benefit or result achieved, the skill required under the circumstances, the ability or expertise of the applicant, and the customary fee for similar services. These factors govern the determination of whether the payment requested by each applicant is reasonable.

## V

■ The lodestar approach—multiplying the time expended by appropriate hourly rates—serves as a starting point to assess the reasonableness of the fees for which approval is requested. See *Lindy Bros. Builders, Inc. v. American Radiator & Std. Sanitary Corp.*, 487 F.2d 161, 167 (3rd Cir.1973). Based on the remaining factors material to determining reasonableness the lodestar figure may be adjusted downward or upward.

■ A division of authority exists on the question of whether compensation should be limited to the prevailing local rate even though the customary billing rate of an attorney or other professional is higher in his own locale. In a recent decision, Judge

Newsome concluded the customary rate of a Los Angeles law firm representing a debtor in a complex case filed in Ohio furnishes the starting point in fixing compensation:

> To limit fees to the rates charged by Cincinnati bankruptcy lawyers, merely because these cases happened to be filed in Cincinnati, would be a position too capricious and parochial to withstand analysis under [Code] § 330.

*Matter of Baldwin United Corp.*, 36 B.R. 401, 402 (Bankr.S.D.Ohio 1984). *Contra In re Sutherland*, 14 B.R. 55 (Bankr.D.Vt. 1981) (Code § 330 limits compensation to cost in community in which legal services rendered). According to Judge Pelofsky, when determining a reasonable fee the court must consider "local sensibilities and the economics of the local bar" as well as the "economics of out-of-state counsel and the customary fee in other jurisdictions." *In re Global Int'l Airways Corp.*, 38 B.R. 440, 443 (Bankr.W.D.Mo.1984). In a complex case compensation based on a professional's customary billing rate, though exceeding the prevailing local rate, may be justified due to the professional's experience or expertise. *In re Atlas Automation, Inc.*, 27 B.R. 820 (Bankr.E.D.Mich. 1983). However, if a local professional with the required expertise could have been retained, a professional from another jurisdiction may be "reasonably compensated" even though the allowed fee is based on a rate lower than his customary charge. *In re Nova Real Estate Inv. Trust*, 25 B.R. 252 (Bankr.E.D.Va.1982), *modified* 30 B.R. 347 (1983) (premium permitted given result obtained).

■ Clearly, in the absence of available local counsel with the personnel and resources necessary in a complex case, the prevailing local rate simply may not be reasonable compensation for a firm outside the jurisdiction whose customary billing

**8.** In addition to the oral objection of Glenn Hodges on behalf of the creditors' committee, six creditors submitted letters to the court either specifically or arguably objecting to payment of the applicants' fees from assets of the debtor's estate. Payment, however, is sought from East

Tennessee Bancorp, whose assets consist of the capital infused by the investor group, the former assets of the Bank of Commerce of Morristown, plus all SIBC assets other than those transferred under the terms of the confirmed plan to the liquidating trust.

rate exceeds the local rate. Likewise, when a firm has expertise uncommon to any local firm, reasonable compensation obviously should not be ascertained by any prevailing local rate.

### Benesch

■ The Benesch application for approval of payment reflects billing for 3,300.75 hours, consisting of 3,263.75 hours for attorneys and 37 hours for legal assistants. Approval of compensation in the amount of $328,817.50 plus reimbursement of expenses totaling $23,623.71 is sought. A statement detailing the services performed is attached to the application. Generally, Benesch was responsible for the formulation and preparation of the debtor's disclosure statement and confirmed plan of reorganization. These tasks required the simultaneous presence in Knoxville of as many as seven lawyers from the Benesch firm on at least one occasion. Benesch also played a principal role in the preparation for hearings on the adequacy of the disclosure statement and the confirmation of the SIBC plan. Further, Benesch provided memoranda of law on various issues; researched sophisticated questions pertaining to securities regulations, including 11 U.S.C.A. § 1145 (1979) (Exemption from securities laws); and assisted co-counsel in various endeavors, including the procurement of FDIC coverage for certificates issued under the SIBC plan. Though twenty different attorneys with Benesch performed some service, seven attorneys, whose hourly billing rate varies from $50 to $190, are responsible for in excess of ninety-five (95) percent (3,132) of the hours billed.

The court finds that $100.23, the average hourly rate for services billed, is an appropriate rate for computing the lodestar. Given the complexity and formidable time pressures involved the rate is not excessive.[9] Multiplying 3,263.75 by $100.23, the lodestar figure is $327,125.66. Considering the result achieved and the skill demonstrated under demanding circumstances,[10] an upward adjustment of the lodestar might have been justifiable. However, Benesch specifically "has not requested and does not request a premium above and beyond the amount of the compensation for services determined by the hours actually rendered in connection with its representation of the Investors ...."[11]

Reasonable payment to Benesch for its services in this case amounts to $327,125.66 for legal fees plus $1,677.50 for fees of legal assistants. Additionally, Benesch is entitled to recover $19,809.48 of the expenses claimed. The balance, $3,814.23, claimed for "computer research" and "document reproduction" should be charged to overhead expenses. See *Matter of Rego Crescent Corp.*, 37 B.R. 1000, 1009 (Bankr. E.D.N.Y.1984) (photocopying on office copier is overhead expense in operation of law office).

### Caplin & Drysdale

■ For its services Caplin & Drysdale (Caplin) seeks approval of fees totaling $26,870.50 and expenses of $2,207.25. The fee request, based on 145.7 attorney hours, equates to an average hourly rate of $184.82.

Caplin primarily dealt with FDIC and the Federal Reserve Board. The first proposal

9. Tenn.Code Ann. § 45–5–609 (Supp.1983) authorized the State Commissioner of Financial Institutions to approve the merger of an industrial loan and thrift like SIBC, after its conversion to an industrial bank, into a state bank, provided a merger agreement was filed on or before *December 1, 1983*. Such a merger was feasible only if a plan of reorganization for SIBC could be confirmed prior to December 1, 1983.

10. Representation of the investor group was afforded the highest priority in the bankruptcy

department of the Benesch firm. The summary of attorney services reflects that 119.75 hours of attorney services were performed by eight attorneys on one day, September 28, 1983. Howard Sokolsky, a partner in Benesch chiefly responsible for the preparation of the SIBC disclosure statement and plan of reorganization, logged 92.5 hours in a six-day period preceding filing of the disclosure statement and proposed plan of reorganization.

11. See Application for Approval of Payment of Compensation at 13, filed March 9, 1984.

**614**

by the investor group was rejected by FDIC, whose counter-proposal was likewise rejected by the investors. Caplin developed, or participated in the development of, four alternative proposals. Extensive negotiations occurred between Caplin and representatives of the two federal regulatory agencies. A review of Caplin's summary of attorney services reveals that twenty-six (26) percent of its charges relate exclusively to telephone conferences.[12] Additional hours are charged to telephone conferences and other services without appropriating the time for each service.

More than seventy (70) percent of Caplin's billing is attributable to one attorney, whose customary billing rate is $195 per hour. Nearly twenty-five (25) percent of the charges are for services of a second attorney whose billing rate is ordinarily $175 per hour. These rates substantially exceed the prevailing local rate in the Knoxville area.

From a careful review of Caplin's application and supporting documents, it does not appear that the general nature of its services was extraordinary. Conferences with members of the investor group, federal regulatory officials, or co-counsel constitute the majority of the time billed. Additionally, a significant amount of time is attributable to preparation of applications to the FDIC and the Federal Reserve Board. The court finds that $100 is an appropriate hourly rate to compute the lodestar, which for Caplin's services is $14,570. However, in recognition of the customary fees and expertise [13] of Caplin's attorneys in the specialized field of governmental regulation of financial institutions, combined with the impracticality of retaining local counsel to negotiate with federal regulatory officials in Washington, D.C., the court finds that $21,855 ($150 per hour) represents reasonable compensation. Caplin is also entitled to recover $2,006.95 of the expenses reported. Postage and "xe-

roxing" expenses totaling $200.30 are disallowed because such costs are overhead expenses.

*Dearborn & Ewing*

■ Dearborn & Ewing (Dearborn), retained as Tennessee counsel for the investor group, requests approval of its fee of $31,415.50 and recovery of expenses totaling $5,271.05. The fee represents 301 hours billed by eleven different attorneys and 20.45 hours of paralegal service.

The services performed by Dearborn, summarized in its application, need not be detailed herein. However, Dearborn was generally responsible for incorporating East Tennessee Bancorp, preparing documents attendant to the merger of SIBC with Bank of Commerce of Morristown, assisting in obtaining confirmation and in consummation of the SIBC plan, and providing legal advice on matters involving both Tennessee and federal law.

The average hourly rate for the legal services billed by Dearborn is $102. James R. Kelley, whose customary billing rate is $110 per hour, is responsible for sixty-six (66) percent of the hours billed. Twenty-nine (29) percent of the attorney time is attributable to four attorneys who customarily charge $85 per hour.

Examining the nature of the services provided by Dearborn, the court finds $100 is a reasonable hourly rate of compensation. Thus, the lodestar for Dearborn's services is $30,100. Although Dearborn contributed to the favorable result achieved, its contribution does not appear to have been extraordinary. Clearly, expertise in commercial and corporate law was required. However, expertise in these two areas of law is not uncommon. The sum of $30,810.75 consisting of $30,100 for legal fees and $710.75 in paralegal fees, represents reasonable compensation for Dearborn's services. Of the $5,271.05 in

12. This equals 38.6 hours.

13. Robert C. Pozen, the attorney responsible for the majority of the services rendered by Caplin, has authored a book on financial institutions

and investment management. His associate, Robert E. Mannion, served for four years as a Deputy General Counsel of the Board of Governors, Federal Reserve System.

expenses for which reimbursement is sought, Dearborn is entitled to $4,438.37. A "xerox" expense of $832.68 is disallowed as an overhead expense.

### Peat Marwick

 Peat Marwick seeks approval of its compensation request of $93,635, plus $10,-755 in expenses, for the period between June 17, 1983, and January 31, 1984. The fee request, based on 724 hours of services, represents an average hourly rate of $129.33. Though no customary hourly rate is reported for the accountants rendering services, Peat Marwick represents that its fee is based on rates normally charged to its clientele as a whole.

Peat Marwick performed a variety of accounting services, beginning with a review of the financial and tax positions of SIBC and two state-chartered banks (Bank of Commerce of Morristown and City and County Bank of Jefferson County) the investors proposed to acquire. Peat Marwick prepared both cash flow projections and projected financial statements. Research involving the tax consequences of a "G" reorganization and other intricate or unusual questions was required. Additionally, many hours were spent conferring with members of the investor group, their attorneys, and federal regulators. Although these services are described in an exhibit to the application, neither the time involved nor the identity of the accountant performing the described service is reported. However, the exhibit does reflect that nearly fifty-five (55) percent of the hours billed are attributable to partners. Also, managers and tax specialists are jointly responsible for approximately forty (40) percent of the time charged.

Because a reasonable rate of compensation for the services performed is $100 per hour, the lodestar figure for Peat Marwick's services equals $72,400. However, considering the difficulty of the issues researched and the time constraints, the expertise required, the contribution toward a successful result, and the fact that the customary rate in Peat Marwick's Chicago office for a partner's services exceeds the lodestar rate, $79,640 ($110 per hour) represents reasonable compensation.

Peat Marwick seeks reimbursement for the following expenses:

| | |
|---|---:|
| Travel, Lodging & Meals | $ 6,797 |
| Delivery | 272 |
| Telephone | 571 |
| Computer Time Charges | 1,109 |
| Photocopying | 195 |
| Secretarial and Administrative Charges | 1,811 |
| | $10,755 |

No documentation to substantiate these charges has been submitted. The court will nonetheless presently approve reimbursement totaling $843 for delivery and telephone expenses. Upon presentation of copies of receipts for travel, lodging and meals, the court will consider approval of those expenses.[14] Reimbursement for the remaining expenses, all of which are overhead expenses, is disapproved.

### VI

Under the former Bankruptcy Act counsel for creditors or shareholders contributing to a Chapter X plan of reorganization were entitled to compensation from the estate. See *Securities and Exchange Comm'n v. First Securities Co.*, 528 F.2d 449, 452 (7th Cir.1976). The applicants unquestionably contributed to the confirmation and consummation of the SIBC plan. As Mr. Bernstein, attorney for the creditors' committee, observed at the hearing on these applications, the services performed by the applicants were necessary. It is unjust to "muzzle the ox when he treadeth out the corn."[15] Other parties would have been required to perform absent performance by the applicants.

---

**14.** Copies of these receipts, if any, should be submitted to the court within fifteen (15) days from entry of the order on Peat Marwick's application for approval of payment of compensation.

**15.** Deuteronomy 25:4; I Timothy 5:18.

Further, the court reiterates that the compensation approved is a charge against the assets of East Tennessee Bancorp. The source of payment is a pool of funds consisting in part of $5,600,000 in capital infused by the investor group, who maintain they would merely have withheld from their investment an amount equaling the compensation sought by the four applicants if any dispute had been anticipated. Viewed from this perspective, and assuming federal regulatory approval could have been obtained with a reduced capital investment and a corresponding elimination of $600,000 in projected organizational costs, the fees in question are essentially being paid by the investor group.

No payment for their services has been received by any of the four applicants. Accepting Cihak's unchallenged testimony that standard accounting principles permit a lump sum "up front" payment of organizational costs, though such costs are disclosed as amortized, East Tennessee Bancorp may pay to applicants the amounts approved as reasonable compensation when the orders for payment become final.