**In re ALLEGHENY INTERNATIONAL, INC., et al., Reorganized Debtors.**

**FULBRIGHT & JAWORSKI, Appellant,**

v.

**SUNBEAM–OSTER COMPANY, INC., Appellee.**

**Civ. A. No. 91–1035.**

United States District Court, W.D. Pennsylvania.

April 7, 1992.

Lawrence W. Boes, New York City, for appellant.

Douglas Campbell, Pittsburgh, Pa., for Official Committee of Creditors.

Michael Lederman, Dennis Lewis, Pittsburgh, Pa., for appellee.

Cynthia Baker, New York City, for reorganized debtor.

George Cass, Pittsburgh, Pa., for former debtor.

## MEMORANDUM OPINION

BLOCH, District Judge.

Before this Court is appellant Fulbright and Jaworski's (F & J) appeal from the bankruptcy court's calculation of attorney's fees in connection with F & J's performance as counsel to the Official Committee of Equity Security Holders of Allegheny International, Inc. (the Equity Committee). For the reasons stated herein, the judgment of the bankruptcy court will be affirmed.

This Court has appellate jurisdiction over these matters pursuant to 28 U.S.C. § 158(a) and Rule 8001 of the Rules of Bankruptcy Procedure. Bankruptcy Rule 8013 provides:

On appeal the district court … may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings. Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses.

B.R. 8013. *Brown v. Pennsylvania State Employees Credit Union,* 851 F.2d 81, 84 (3d Cir.1988); *In re Morrissey,* 717 F.2d 100, 104 (3d Cir.1983). Fee awards are factual determinations of the bankruptcy court and, as such, are subject to an abuse of discretion standard of review by the district court. *In re Beverly Manufacturing Corp.,* 841 F.2d 365, 369 (11th Cir. 1988); *In re T & D Tool, Inc.,* 132 B.R. 525 (E.D.Pa.1991). An abuse of discretion can occur only "when the bankruptcy judge fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." *In re U.S. Golf Corp.,* 639 F.2d 1197, 1201 (5th Cir.1981); *United States & Internal Revenue Service v. Owens,* 84

**338**

B.R. 361 (E.D.Pa.1988). Questions of law are subject to *de novo* review. *See Brown*, 851 F.2d at 84.

As a general matter, the reasonableness of an attorney's fee is a question of fact. *Matter of Lee*, 884 F.2d 897, 899 (5th Cir. 1989); 2 *Collier on Bankruptcy* ¶ 329.04 at 329–18 (15th ed. 1992). Under the clearly erroneous standard, "[i]t is the responsibility of an appellate court to accept the ultimate factual determination of the factfinder unless that determination either is completely devoid of minimum evidentiary support displaying some hue of credibility or bears no rational relationship to the support of evidentiary data." *Hoots v. Commonwealth of Pennsylvania*, 703 F.2d 722, 725 (3d Cir.1983); *Krasnov v. Dinan*, 465 F.2d 1298, 1302–03 (3d Cir.1972).

F & J argues that the bankruptcy court abused its discretion by (1) failing to award F & J rates customarily charged by New York law firms; and (2) failing to apply the proper legal standard with regard to compensation for services performed in furtherance of the Equity Committee's participation in the debtor's annual meeting and election of directors. The Court shall discuss the pertinent facts and applicable law as to each issue separately.

## I. Local v. New York rates

### A. Facts

In February, 1988, Allegheny International, Inc. (AI) and eleven of its affiliates and subsidiaries (collectively with AI, the debtor) filed petitions for relief under Chapter 11 of the Bankruptcy Code, and the cases were administratively consolidated. The debtors continued operating their businesses and managing their properties as debtors-in-possession under §§ 1107 and 1108 of the Bankruptcy Code. On or about April 4, 1988, the United States Trustee appointed the Official Committee of Equity Security Holders of Allegheny International, Inc. (the Equity Committee) pursuant to § 1102(a)(1) of the Code. On April 5, 1988,

the Equity Committee selected F & J's predecessor, Reavis & McGrath,[1] to represent it in these Chapter 11 cases. On or about May 12, 1988, pursuant to 11 U.S.C. § 1103(a), the bankruptcy court entered an order authorizing the employment and retention of F & J as attorneys for the Equity Committee. F & J petitioned the bankruptcy court for a final award of professional fees on February 22, 1991. The court reviewed the professional fee applications of F & J, evaluated the professional services provided by F & J and awarded fees pursuant to a final fee order dated April 18, 1991 (the final compensation order). The bankruptcy court's final compensation order awarded to F & J total fees and expenses of $2,024,644.16 plus $38,-226.60 in fees and expenses incurred by F & J for preparing its fee applications resulting in a total fee award of $2,062,-910.76.

In its general discussion of the requested fees submitted by a number of law firms in this case (all of which are Pittsburgh area firms apart from F & J), the bankruptcy court in an opinion dated December 14, 1989 (the 12/14/89 opinion), stated that the hourly rates requested by the firms were too high in that they departed from the cost of comparable services in western Pennsylvania. The court stated:

> Although the court is aware that the power to make decisions in this, or any, case ultimately rests with the client, in a Chapter 11, this court holds all bankruptcy professionals to the task of movement toward a confirmed plan of reorganization. Rather than rapidly moving toward confirmation, this reorganization has reinvented the wheel several times. The court suspects that greed and personality clashes by clients and professionals have contributed to the lack of progress in this case. Because the professionals have not achieved reorganization in 22 months, this court concludes that the premium rates of compensation which they have requested are not appropriate.

---

1. On January 1, 1989, Reavis & McGrath merged with the law firm of Fulbright & Jaworski. While the name Fulbright Jaworski & Reavis & McGrath was retained through December, 1990 in New York, the firm is currently named Fulbright & Jaworski. Throughout this opinion, the predecessor firm will be referred to as F & J.

In determining what is a reasonable hourly rate, bankruptcy courts are generally cognizant of the going rates of the counsel that practice before them. In *In re Shaffer–Gordon Associates, Inc.*, 68 Bankr. 344, 350 (Bankr.E.D.Pa.1986), the bankruptcy court succinctly observed that it had "the experience of reviewing numerous applications seeking various hourly rates in our local bankruptcy court marketplace...." This court is equally experienced, and our experience tells us that the market rate in Western Pennsylvania for bankruptcy counsel of high caliber is $150 per hour. We routinely observe quality bankruptcy work billed at that rate in chapter 11 cases by partners, and lessor amounts by associates....

\*　\*　\*　\*　\*　\*

Although this case has frequently required intense efforts for short periods of time, it also has had many routine matters that are typical of all bankruptcy cases. Such matters do not deserve premium rates. For example, every relief from stay motion does not require participation from all of the committees at their top rate.

Our determination of reasonable hourly rates is consistent with the determination of a lodestar, which is "properly calculated by multiplying the number of hours reasonably expended on the litigation times a reasonable hourly rate." *Student Public Interest Research Group v. AT & T Bell Laboratories*, 842 F.2d 1436, 1441 (3d Cir.1988) (quoting *Blum v. Stenson*, 465 U.S. 886, 888 [104 S.Ct. 1541, 1544, 79 L.Ed.2d 891] (1984)). The degree of success is usually used as a multiplier (either positive or negative) to the lodestar. We thus believe that it is appropriate to reduce the requested hourly rates because of the lack of success. We also think that the lack of risk of payment, since professional fees receive a high priority under the Bankruptcy Code, justifies a reduction in the hourly rate and is not inconsistent with the lodestar approach.

12/14/89 opinion at 4–7 (footnote omitted). The bankruptcy court also noted that petitioners, as of the date of the final compensation order, had already received 50 percent of the fees they had billed. *Id.* at 7, n. 6.

As to F & J in particular, the bankruptcy court stated as follows:

Because the firm is located in New York City, where legal services (and everything else) are more costly, [F & J] seeks compensation significantly higher than the other petitioners. Those rates may or may not be "usual and customary" in New York City. However, we cannot conclude that the Equity Committee was unable to hire counsel from Pittsburgh or other cities with lower rates, if it chose to do so. For its own reasons, the Equity Committee chose to hire counsel from a very expensive market—New York City, "but it will not be the estate's responsibility to pay the difference between the hourly rate the court deems acceptable and the rate charged." *In re R & B Institutional Sales, Inc.*, 65 Bankr. 876, 885 (Bankr. W.D.Pa.1986). Although there is no duty to exhaust the pool of local counsel before hiring out-of-town counsel, we conclude that the Equity Committee could have hired less costly, but equally competent, counsel from another city.

We recognize that the chairman of the Equity Committee is located in New York City. On a day-to-day basis, the availability of telephone conferences largely negates the inconvenience of using counsel in another city. Moreover, any saving of costs resulting from the Equity Committee using New York counsel (i.e., the absence of expenses for travelling to meetings of the Equity Committee) would be offset by the higher rates and the expense of travelling to Pittsburgh for court proceedings and meetings with the other constituencies. We further recognize that bankruptcy practice, with respect to large chapter 11's such as this case, is national in scope. Therefore, we do not believe that the allowable rates of attorney compensation in cases before the United States

Bankruptcy Court for the Southern District of New York should be the national standard.

Nevertheless, we will allow a moderately higher rate, $225 per hour, to one attorney, Gary L. Blum, Esq. Other partners and of counsel attorneys are entitled to $175 per hour or the hourly rate stated in the Application for Interim Compensation of [F & J contained in its initial fee petition], whichever is less. Associates are entitled to $125 per hour or the hourly rate stated in the initial [F & J] fee petition, whichever is less.

12/14/89 opinion at 10–11. Thus, whereas the market rate in western Pennsylvania was found to be $150 per hour for high caliber counsel, the bankruptcy court allowed F & J $225 per hour to Attorney Blum, and up to $175 per hour for partners and of counsel attorneys. With the exception of four partners at Buchanan Ingersoll who were found to play massive roles in the case, partners at the other three firms were allowed $125 to $160 per hour. As for associates, the bankruptcy court awarded $125 per hour, in contrast to $90 to $100 per hour for the other three firms involved.

### B. Statement of the law

█ The Bankruptcy Code requires that fees paid to counsel for the debtor, a trustee or an official committee of creditors or equity security holders be subject to review by the bankruptcy court for reasonableness. Section 330 states in relevant part:

> (a) After notice to any parties in interest and to the United States trustee and a hearing, and subject to sections 326, 328, and 329 of this title, the court may award to a . . . professional person employed under section . . . 1103 of this title . . .—
>
> (1) reasonable compensation for actual, necessary services rendered by such . . . professional person . . . based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

> (2) reimbursement for actual, necessary expenses.

The legislative history of § 330 and the case law construing it establish that § 330 is intended to replace the notion of "economy of administration" reflected in the former Bankruptcy Act with a more liberal and enlightened standard of compensation. *See* H.R.Rep. No. 595, 95th Cong., 1st Sess. 329–30, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6286; 124 Cong.Rec. H11,089 (1978) (remarks of Rep. Edwards), *reprinted in* 1978 U.S.Code Cong. & Ad. News 6436, 6442 (stating that notions of economy of the estate in fixing fees are outdated and have no place in a Bankruptcy Code).

However, as evidenced by the plain language of § 330, compensation is not to be automatically granted at the rates requested; the compensation awarded must be reasonable, based on the nature, the extent, and the value of the professional services rendered. 11 U.S.C. § 330(a)(1). Many courts have held that reasonableness encompasses the bankruptcy court's responsibility "to balance a spirit of economy on the one hand with fees sufficiently close to market rates to attract qualified counsel on the other." *Boston & Maine Corp. v. Sheehan, Phinney, Bass & Green, P.A.,* 778 F.2d 890, 989 (1st Cir.1985) (citations omitted). The bankruptcy court is within its discretion to "act as 'client', 'objecting' to excessive fees which it deems to overstep" the parameters of § 330. *In re Metro Transportation Co.,* 107 B.R. 50, 52 (E.D.Pa.1989); *see also Unsecured Creditors' Committee v. Puget Sound Plywood (In re Puget Sound Plywood, Inc.),* 924 F.2d 955 (9th Cir.1991). The burden of proof as to the reasonableness of the requested compensation always remains with the applicant. *Metro Transportation,* 107 B.R. at 53. In addition to ascertaining the nature and extent of the services supplied by the attorney and determining the value of the services according to the customary fee and quality of the legal work, 11 U.S.C. § 330(a)(1), the bankruptcy court should adjust the compensation on the basis of any other significant factors.[2] *Leroy v. City of*

---

**2.** Significant factors have been found to include: (1) the time and labor required; (2) the novelty

*Houston*, 831 F.2d 576, 583 n. 11 (5th Cir. 1987), *cert. denied*, 486 U.S. 1008, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988). *See also In re Fine Paper Antitrust Litigation*, 751 F.2d 562 (3d Cir.1984). The parties disagree on the issue of whether compensation for professional fees should be limited to the prevailing local rate even though the customary billing rate of the professionals at issue may be higher in their own locale. Under appropriate circumstances, non-local rates are to be used as a reference in fee awards. The Court finds that the bankruptcy court properly considered the fact that New York market rates are higher than those of western Pennsylvania, and adjusted F & J's fee award according to other significant factors.

In *Matter of Baldwin United Corp.*, 36 B.R. 401 (Bankr.1984), the bankruptcy court determined that a reasonable fee entailed consideration of rates customarily charged by the non-local counsel. In *Baldwin United*, the Los Angeles firm of O'Melveny & Myers had been appointed as debtors' bankruptcy counsel in a complex Cincinnati reorganization which was national in scope. Similar to other firms involved in that reorganization, O'Melveny & Myers was nationally prominent in the type of reorganization at issue. In that case, the law firm applied for a preliminary ruling on allowable fees in an amount significantly higher than those customarily charged by Cincinnati law firms. The bankruptcy court held that the starting point for determining fee awards should be the rate charged by the non-local counsel in its own marketplace. *Id.* at 403. *See In re Atlas Automation*, 27 B.R. 820, 823 (Bankr. E.D.Mich.1983); *see generally Northcross v. Board of Education of Memphis City Schools*, 611 F.2d 624, 636 (6th Cir.1979).

In considering the fee application, the *Baldwin United* court stated:

> To apply Cincinnati hourly rates for the services these professionals perform might result in an attempt to resign from their positions, and might effectively deprive the debtors-in-possession of their expertise and experience. Such a result would not only be a crippling blow to the debtors and their creditors, but would also violate the spirit of the Bankruptcy Code and governing case law....

> To limit fees to the rates charged by Cincinnati bankruptcy lawyers, merely because these cases happened to be filed in Cincinnati, would be a position to capricious and parochial to withstand analysis under § 330.

*Baldwin United*, 36 B.R. at 412. The court stated that, after considering the non-local rate, the court should consider, *inter alia*, "the nature and difficulty of the work performed; whether the work could have been performed by someone with less experience at a lower rate; whether the rate is in line with rates charged by comparable professionals with offices in the same locale as the applicant; and most importantly, whether the value of the services rendered to the debtor justify the rate charged." *Id.* at 403.

Bankruptcy courts have also held that, in determining a reasonable fee, the court must consider "local sensibilities and the economics of the local bar" as well as the "economics of out-of-state counsel and the customary fee in other jurisdictions." *In re Southern Industrial Banking Corp.*, 41 B.R. 606, 612 (Bankr.E.D.Tenn.1984) (*quoting In re Global Int'l. Airways Corp.*, 38 B.R. 440, 443 (Bankr.W.D.Mo.1984)). The *Southern Industrial Banking* court recognized, however, that "if a local professional with the required expertise could have been

---

and difficulty of the questions presented by the case; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time pressures imposed by the client or the circumstances; (8) the amount involved and the results obtained as a result of the attorney's services; (9) the experi-

ence, reputation and ability of the attorney; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.1977), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).

retained, a professional from another jurisdiction may be 'reasonably compensated' even though the allowed fee is based on a rate lower than his customary charge." *Southern Industrial Banking,* 41 B.R. at 612, *citing In re Nova Real Estate Investment Trust,* 25 B.R. 252 (Bankr.E.D.Va. 1982), *modified,* 30 B.R. 347 (1983) (premium permitted given result obtained).

Similarly, in *In re R & B Institutional Sales, Inc.,* 65 B.R. 876 (Bankr.W.D.Pa. 1986), the bankruptcy court considered the type of case and quality of services rendered by professionals in a Chapter 11 reorganization, and found that New York rates would not be approved for services of a New York firm. That court stated:

> We recognize that this is a New York firm, and that these fees might be acceptable as usual and customary for that area; but, this is not the case in Pittsburgh. A multitude of accounting firms having local offices would have been more than competent to proceed for the Committee [of Unsecured Creditors]. This was not a complicated or difficult case. The Committee may have felt it necessary to bring in an accounting firm from another area, but it will not be the estate's responsibility to pay the difference between the hourly rate the court deems acceptable and the rate charged.... While the Committee chose these accountants, it cannot expect the estate to take responsibility for such excess charges.

*R & B Institutional Sales,* 65 B.R. at 885. In both *Southern Industrial Banking* and *R & B Institutional Sales,* the bankruptcy court awarded fees to non-local firms higher than that of local firms, but lower than that requested.

As noted *supra,* the bankruptcy court awarded F & J fees significantly in excess of those normally charged by firms in western Pennsylvania. The court awarded these fees in spite of the fact that it found the reorganization had "reinvented the wheel several times" and that reorganization had not been successfully achieved after 22 months. (12/14/89 opinion at 5). Further, the court found that "although

this case has frequently required intense efforts for short periods of time, it also has had many routine matters that are typical of bankruptcy cases. Such matters do not deserve premium rates." *Id.* at 7. The court also found that the lack of risk of payment and the lack of success justify a reduction in the hourly rate. *Id.* These factors merited a decrease in hourly rates. This Court does not find the bankruptcy court's fee award to be clearly erroneous.

■ This Court finds *In re Temple Retirement Community, Inc.,* 97 B.R. 333 (Bankr.W.D.Tex.1989), to be persuasive. That court stated:

> [m]any bankruptcy cases are often more regional or even national than they are local in scope, so that looking solely to the local community's range of rates would impose an unnecessarily parochial cap on the case. *See In re Public Service Co. of New Hampshire,* 86 B.R. 7, 11 (Bankr.D.N.H.1988). In addition, bankruptcy is sufficiently specialized that a firm with the skills necessary to meet the needs of a particular debtor might not be available in the local community.

*Temple Retirement,* 97 B.R. at 342. In that case, a Waco, Texas debtor hired a Dallas firm with a national reputation of bankruptcy experience to assist its reorganization. In deciding whether to grant the fees requested by the Dallas firm, the *Temple Retirement* court believed that limiting the lodestar amount to that customarily charged in the Waco, Texas area would have effectively deprived the debtor of its choice of counsel; thus, the court awarded higher fees for non-local counsel. Unlike the facts of the instant case, that court stressed that the attorneys "achieved an extraordinarily favorable result for the estate with a minimum of litigation, and did so in a remarkably short period of time." *Id.* at 343. However, the same court recognized, as did the bankruptcy court in the instant case, that "[n]ot every case warrants going outside the local community for representation." *Id.*

Although the AI case was national in scope and at times involved complex issues,

the bankruptcy court found that the services provided by F & J were readily available in the Pittsburgh area, and did not merit the rate they requested. *See also* 1/30/91 opinion at 6 (indicating the bankruptcy court's belief that the activities of the Equity Committee, supported by its professionals, unnecessarily complicated the case by engaging in unnecessary litigation, raising "barely colorable" appeals and creating a level of contentiousness which led to a lack of progress and a lengthy reorganization). As held in *Washington Manufacturing Co.*, 101 B.R. 944 (Bankr.M.D.Tenn.1989),

> In an appropriate case, the prevailing rates of non-local counsel or the rate prevailing in the case locality should be merely factors, not self-limiting ones, in the court's determination of the reasonableness of the over-all charges made and sought. *Temple Retirement*, 97 B.R. at 10; *Public Service*, 86 B.R. at 10. Ultimately, the allowable rate "is what the court perceives to be the reasonable value of the services in the marketplace [however small or expansive that may be under the circumstances of each case], with due deference to the cost of comparable services.

*Washington Manufacturing*, 101 B.R. at 952 (*quoting In re Gulf Consolidated Services, Inc.*, 91 B.R. 414 at 420 n. 4 (1991)). Based on the high rate allowed to F & J, in conjunction with the bankruptcy court's expression of dissatisfaction with the quality of legal work performed by F & J, it is clear that the bankruptcy court did consider the fact of New York City's higher market rates and then adjusted downward after ascertaining the nature and extent of the services supplied by F & J, considering the value of the services according to the customary fee and quality of the legal work and, finally, adjusting the compensation on the basis of other significant factors.

This Court is further persuaded by the bankruptcy courts which have held that "even if the billing rates themselves are justified, the total bill must *itself* be reasonable." *Temple Retirement*, 97 B.R. at 343, *citing Public Service*, 86 B.R. at 11 n. 7. As expressed in *Public Service*,

The regular hourly rates simply do not become *ipso facto* final fee awards in this court. Retention of attorneys at high hourly rates is based not only upon the assumption that attorneys billing at such rates have the necessary experience and competence to handle complex matters, but also upon the further assumption that attorneys billing at such high rates can normally perform their duties in fewer hours than less experienced attorneys who may bill at a lower rate. If that does not prove true with regard to the providing of particular services in this case, the court will not feel compelled at the time of final fee awards to allow the full hourly rate for any such services. This is not to say that the court intends to employ a liberal dose of "hindsight" at the conclusion of the case, or to "second-guess" actions and decisions undertaken by attorneys in good faith as the situation appeared to them at the time such actions or decisions were necessary. *Cf. B & M Railroad Corp. v. Moore*, 776 F.2d 2, 8, 10, 54 B.R. [41], [47], [49] (1st Cir.1985).

*Public Service*, 86 B.R. at 11–12 (footnote omitted).

In F & J's supplemental brief, it argues that this Court's decision in *In re Allegheny International, Inc.*, 131 B.R. 24 (W.D.Pa.1991), mandates that New York rates apply. F & J misreads this Court's opinion. That opinion was limited to the question of whether the bankruptcy court erred in failing to explain its denial of fees to Wells Fargo's New York legal counsel. This Court found that using western Pennsylvania as the relevant market for a determination of reasonable hourly rates was improper under those facts because the court had already tacitly approved the use of the New York firm. Such was not the case on the instant facts. Further, in the Wells Fargo case, the bankruptcy court applied rates based upon the 12/14/89 opinion which is the subject of the instant appeal. That opinion did not discuss Wells Fargo, nor did it discuss the performance of Wells Fargo's legal counsel. On the facts of the instant case, the Court finds that the bankruptcy court adequately ex-

plained its reasons for not applying New York rates to F & J's fee requests. Because this Court finds that the bankruptcy court properly considered the fact that the New York market rates are significantly higher than those in western Pennsylvania and awarded fees to F & J in accordance with that higher rate and in conjunction with the bankruptcy court's perception of the quality of legal services rendered, the bankruptcy court fee award will be affirmed.

## II. The proxy battle

F & J's second argument on appeal is that the bankruptcy court erred in disallowing their fees in connection with the disputed annual meeting of stockholders and the related proxy battle.

### A. Facts

The facts of this issue, which largely have been stated by the bankruptcy court in its 12/14/89 opinion, are as follows. On or about April 4, 1988, the United States Trustee appointed the Equity Committee pursuant to 11 U.S.C. § 1102. On April 5, 1988, the Equity Committee selected F & J's predecessor, Reavis & McGrath, to represent it in these Chapter 11 cases. On May 12, 1988, the bankruptcy court authorized the employment and retention of F & J as counsel for the Equity Committee pursuant to 11 U.S.C. § 1103(a).

The debtor scheduled a routine annual meeting for May 20, 1988. Shortly thereafter, Spear, Leeds & Kellogg (Spear, Leeds), chairman of the Equity Committee, filed preliminary proxy materials with the SEC, in which Spear, Leeds stated its intention to solicit proxies in an effort to control the board of directors of the debtor. Bomar Holdings, Inc. (Bomar), another member of the Equity Committee, joined Spear, Leeds in their efforts. Thereafter, Spear, Leeds and Bomar conducted their proxy battle under the aegis of the Election Committee of the Equity Security Holders. The United States Trustee did not appoint nor did the bankruptcy court authorize the formation of the Election Committee.

The Creditors' Committee applied to the bankruptcy court to enjoin the meeting of the shareholders of the debtor. By order dated May 16, 1988, which was followed by a memorandum opinion on May 17, 1988, the bankruptcy court enjoined the debtor from conducting the annual meeting of the shareholders within 90 days of May 20, 1988. Thereafter, the Equity Committee, the Unofficial Shareholders Election Committee of the Equity Committee and Spear, Leeds appealed to this Court, which reversed the bankruptcy court and reinstated the annual meeting. The Creditors' Committee then filed a writ of mandamus to the United States Court of Appeals for the Third Circuit. The Third Circuit reinstated the bankruptcy court's order pending a review the petition for writ of mandamus by a panel of the Third Circuit. The Court of Appeals denied the petition. This Court then reset the annual meeting for June 20, 1988, and allowed the proxy solicitation to continue. In the meantime, the Court of Appeals granted an expedited appeal, but denied the Creditors' Committee's motion for a stay pending appeal, if both the votes were impounded and the debtor did not promulgate a plan of reorganization until the appeal was to be heard. Because the parties did not agree to those conditions, the Court of Appeals denied the stay and this Court ordered the debtor to conduct the annual meeting on June 20, 1988. Directors sympathetic to the management of the debtor maintained a majority of the directorships. The appeal was then withdrawn.

### B. Statement of the law

■ Under the law, shareholders have a right to hold an annual meeting and participate in the election of a board of directors. See The Official Committee of Unsecured Creditors of Allegheny International, Inc. v. Allegheny International, Inc. (In re Allegheny International, Inc.), No. 88-1101, slip op. at 6–7 (W.D.Pa. May 31, 1988). That issue having already been resolved, the issue for this Court is whether the bankruptcy estate should pay counsel fees resulting from litigation relating to the proxy battle which has been found by

the bankruptcy court to inure to the benefit of individual Equity Holders, i.e., Spear, Leeds and Bomar, instead of to the Official Equity Committee.

The powers of an equity security committee are governed by 11 U.S.C. § 1103(c), which states as follows:

A committee appointed under section 1102 of this title may—

(1) consult with the trustee or debtor-in-possession concerning the administration of the case;

(2) investigate the acts, conduct, assets, liabilities, and financial condition of the debtor, the operation of the debtor's business, and any other matter relevant to the case or to the formulation of a plan;

(3) participate in the formulation of a plan, advise those represented by such committee of such committee's determinations as to any plan formulated, and collect and file with the court acceptances or rejections of a plan;

(4) request the appointment of a trustee or examiner under section 1104 of this title; and

(5) perform such other services as are in the interest of those represented.

In the 12/14/89 opinion, the bankruptcy court found that Spear, Leeds and Bomar, in conducting the proxy battle, in effect were not serving the interests of those represented, i.e., the Equity Committee and the shareholders. Instead, the court found:

The activities of the Election Committee extended the efforts of Spear, Leeds, which preceded the creation of the Official Equity Committee and have not benefitted the estate. Rather, we find that their activities were for the benefit of Spear, Leeds and Bomar. Therefore, the activities by [F & J] in connection with the proxy fight are disallowed in their entirety.

(12/14/89 opinion at 26–27).

■ In order to be compensable from estate funds, the services rendered by an attorney must have been performed in the interest of those represented, i.e., the Equity Committee and the equity security hold-ers as a group. *In re A & A Energy Properties, Ltd.,* [865 F.2d 256 (table), 1988 WL 135911] No. 87–2197, 1988 U.S.App. LEXIS 17401 (6th Cir.1988). This holding comports with 11 U.S.C. § 1103(c)(5)'s statement that an appointed committee may "perform such other services as are in the interest of those represented." In this case, the bankruptcy court specifically found as a matter of fact that the proxy battle litigation was for the benefit of Spear, Leeds and Bomar, and not for the benefit of the Equity Committee and the shareholders as a group. In the bankruptcy court's 1/30/91 opinion, it stated:

it appears to the court that the Equity Committee was dominated by, if in fact it was not the alter ego of, [Spear, Leeds]. The predecessor law firm represented Spear, Leeds prior to being selected as counsel to the Equity Committee. The court questions whether the Committee's actions have been representative of the interests of all of the equity holders. The court's suspicion was heightened when the Equity Committee opposed confirmation of the plan, notwithstanding a vote in favor of the plan by two of the three classes of equity holders which it represented.

(1/30/91 opinion at 4–5).

The bankruptcy court's finding and the consequent denial of fees in connection with the proxy battle are supported by *A & A Energy Properties.* The *A & A Energy Properties* court held that attorney's fees were compensable, but only after finding that there was evidence that the committee represented all of its members at the same time and that there was no evidence showing that the committee acted for any one creditor in conflict with the other members. *A & A Energy Properties,* [865 F.2d 256 (table), 1988 WL 135911], 1988 U.S.App. LEXIS 17401, at *6–7. In contrast, the bankruptcy court here found that the motivating force behind the proxy battle litigation was not the shareholders as a group, but rather was two specific groups who did not have the best interests of the shareholders in mind.

This Court does not find the factual determination of the bankruptcy court to be clearly erroneous. The bankruptcy court constantly dealt with all parties at issue in this case and was in the best position to evaluate their actions and determine their motives.

The bankruptcy court's holding that the proxy battle litigation was in fact conducted by and on behalf of Spear, Leeds and Bomar, through their self-appointed Election Committee, also supports denial of fees based on 11 U.S.C. § 1102(a), which reads:

(1) As soon as practicable after the order for relief under Chapter 11 of this title, the United States trustee shall appoint a committee of creditors holding unsecured claims and may appoint additional committees of creditors or of equity security holders as the United States trustee deems appropriate.

(2) On request of a party in interest, the court may order the appointment of additional committees of creditors or of equity security holders if necessary to assure adequate representation of creditors or of equity security holders. The United States trustee shall appoint any such committee.

The bankruptcy court found that because the Election Committee, which was the force behind the proxy battle, was not formed in accordance with the 11 U.S.C. § 1102, counsel would not be authorized in that connection under 11 U.S.C. § 1103. Accordingly, the fees generated by that proxy battle are not compensable. The court stated:

[t]he United States trustee argued that the Bankruptcy Code does not authorize a separate subcommittee to an official committee. This court is unaware of any authority for the creation of a subcommittee by the Equity Committee to conduct a proxy dispute. Section 1102(a)(2) of the Bankruptcy Code, 11 U.S.C. § 1102(a)(2), enables a party in interest to request the formation of additional committees. That did not occur. Rather, Spear, Leads and Bomar created the Election Committee, which was ostensibly a subcommittee of the Equity Committee. The court finds that the Election Committee was a *de facto* additional committee, which had not been properly constituted pursuant to 11 U.S.C. § 1102(a)(2).

(12/14/89 opinion at 26–27). Because the proxy battle litigation was found in substance, although not in form, to be carried on by an unauthorized subcommittee, the costs incurred in connection with that litigation are not compensable by the estate under the Code. Accordingly, the Court will not disturb the bankruptcy court's ruling that the costs attendant thereto were not subject to reimbursement under the Bankruptcy Code. Therefore, the order of the bankruptcy court denying fees will be affirmed.

### III. Interest on attorney's fees

F & J raises the issue of recoverability of interest on its attorney's fee award pursuant to 28 U.S.C. § 1961. This issue was not raised or referred to in its Statement of the Issues on appeal, nor was it raised until F & J submitted a supplemental brief, five months after its initial brief. Courts generally decline to address issues that have not been passed upon below absent exceptional circumstances. *See Equibank, N.A. v. Wheeling–Pittsburgh Steel Corp.*, 884 F.2d 80, 86 (3d Cir.1989). F & J has not contended that exceptional circumstances exist for its failure to raise this issue below or to raise it in its Statement of the Issues on appeal. Therefore, the Court in its discretion declines to hear this issue. *Id. See also Selected Risks Insurance Co. v. Bruno*, 718 F.2d 67 (3d Cir.1983).

An appropriate Order will be issued.